**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| **MELISSA TAYLOR,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**MARINER FINANCE, LLC, JP MORGAN CHASE BANK, N.A., DISCOVER FINANCIAL SERVICES, LLC, EQUIFAX INFORMATION SERVICES, LLC, EXPERIAN INFORMATION SOLUTIONS, INC. and TRANS UNION, LLC,**<br><br>**Defendants.** | **Civil Case No. 0:25-cv-00060-JRT-JFD**<br><br>**ORAL ARGUMENT REQUESTED** |

# PLAINTIFF'S AMENDED MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANT MARINER FINANCE

**Yitzchak Zelman, Esq.**
**MARCUS ZELMAN, LLC**
**701 Cookman Avenue, Suite 300**
**Asbury Park, New Jersey 07712**
**Phone: (732) 695-3282**
**Fax: (732) 298-6256**
***Lead Counsel for the Plaintiff***
***Melissa Taylor***

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT……………………………………...………..………..1**

**PROCEDURAL HISTORY…………………………………….…………………….2**

**PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF FACTS………4**

**PLAINTIFF'S ADDITIONAL STATEMENT OF FACTS…………………………..29**

**ARGUMENT…………………………………………………………………........27**

**A. Summary Judgment Is Not Warranted On Mariner's Claim That Its Investigations Were Reasonable As A Matter Of Law…………………….31**

**B. Plaintiff Suffered Actual Damages Because Of The Defendant's Persistent Refusal To Remove The Fraudulent Account From Her Credit Reports………………………………………………………………...43**

**CONCLUSION……………………………………………………………………47**

## PRELIMINARY STATEMENT

This Amended Memorandum of Law is submitted in Opposition to the Motion for Summary Judgment submitted by Defendant Mariner Finance. This is a case where Mariner reported an undisputably-fraudulent account on Ms. Taylor's credit reports, and then refused to remove that fraudulent account despite Ms. Taylor trying 6 separate times - over the course of 3 years - to get this corrected. And we know that a reasonable investigation absolutely could have resulted in a different outcome, where (1) Ms. Taylor submitted sworn statements to Mariner letting them know that her mother (Deanna Taylor) had opened this account in her names, (2) the funds from the Mariner loan account were deposited into Deanna Taylor's travel agency account, as reflected on the back of the Mariner check in Mariner's possession, and (3) **where Deanna Taylor has admitted under oath that she opened this account in the Plaintiff's name**.

In nevertheless seeking summary judgment in this case, Mariner's Motion is premised on two separate theories, neither of which are properly supported by the record in this action.

*First,* Defendant argues that the investigations that its investigator (Jamie Myers) undertook into Ms. Taylor's disputes were reasonable as a matter of law, and that no reasonable jury could find otherwise. The problem for Mariner is that it has zero admissible evidence to support this argument. Instead, after first testifying at its 30(b)(6) deposition that it has no evidence or business records as to what Ms. Myers did in response to Ms. Taylor's disputes submitted over the past 4 years, Mariner then sprung an extensive 58-paragraph Declaration from that same Ms. Myers. The Court then allowed us to take Ms.

Myers' deposition, and what we learned at that deposition is that her Declaration – detailing all the extensive steps that she supposedly took to investigate the Plaintiff's 6 separate credit reporting disputes – is a **complete and total lie**. In her deposition, Ms. Myers repeatedly admitted that she has **zero** memory of any of these dispute investigations, out of the thousands of investigations she has carried out over the past decade. She further testified that she has zero knowledge of many of the things she swore to in her Declaration, that she signed just several months ago. Considering how much motion practice, time and cost went into debunking this completely false Declaration, Defendant should be sanctioned under FRCP 56(h) for filing it – not granted summary judgment based on it.

*Second,* Mariner argues that Ms. Taylor suffered zero harm from the fact that it kept this fraudulent account on her credit report for years on end, and that her FCRA claim therefore fails. However, the undisputed record in this action demonstrates that Ms. Taylor suffered serious emotional distress, which manifested in physical symptoms and required multiple anti-depressants to help treat. *See,* Declaration of Melissa Taylor. She very clearly has suffered actual damages, and therefore has a viable claim to present to the jury.

For the reasons set forth below, it is respectfully submitted that the Defendant's Motion for Summary Judgment cannot possibly be granted.

## PROCEDURAL HISTORY

On October 20, 2025, the Plaintiff took the deposition of Mariner pursuant to FRCP 30(b)(6). Among the topics noticed for that deposition were the following:

Topic 11: Defendant's investigations into Plaintiff's alleged Mariner account,

including the result of those investigations, the identities of the investigators who conducted those investigations and the documents consulted in those investigations.

Topic 12: Defendant's investigation following its receipt of notice from Plaintiff that she had not incurred the disputed balance on the account or otherwise opened or authorized this account.

*See,* Exhibit B, page 2.

At that deposition, Mariner's corporate deponent testified that – although Mariner's records reflected the name 'Jamie Myers' next to each of Plaintiff's six disputes – he didn't know if Jamie Myers was necessarily the individual who handled these disputes. *See,* Exhibit A, 64:19 – 65:5. Instead, the system automatically inputs all comments under Teller 10, which is associated with Jamie Myers, whether she was actually the inputter of that information or not. *See,* Exhibit A, 64:19 – 66:7. Mariner's corporate deponent further testified that Mariner has zero business records reflecting what its dispute investigators looked at when investigating Ms. Taylor's disputes throughout 2021, 2023 and 2024. *See,* Exhibit A, 36:23 – 38:13; 47:5 – 48:25. As such, Mariner had zero knowledge as to what, exactly, its dispute investigators did when 'investigating' Ms. Taylor's six account, instead being forced to assume that these investigators perfectly followed Mariner's policies and procedures each and every time[1]. *See id.; see also,* Exhibit A, 57:14-21.

On November 20, 2025, Defendant then filed its Motion for Summary Judgment, arguing that its investigations into the Plaintiff's 6 credit reporting disputes were

---

[1] The problem with this assumption was highlighted with the testimony of Defendant's actual dispute investigator, who testified that she *does* make mistakes during the investigations she conducts, and that she cannot remember if she did so during the six investigations at issue in this case. *See,* Exhibit H, 89:9-23.

reasonable as a matter of law. That Motion is almost entirely based on a 9-page, 58-paragraph from Defendant's dispute investigator, an individual named Jamie Myers. *See,* Docket 74-1. On December 5, 2025, the Plaintiff filed a Motion to Strike Ms. Myers' Declaration, pursuant to FRCP 37(c)(1), since Defendant had failed to ever disclose her as a witness, as required by FRCP 26(a)(1)(A). *See,* Docket 79-81. On December 8, 2025, the Plaintiff also filed a Motion for an Extension of Time to Complete Discovery, and a Motion to Compel the deposition of Ms. Myers. *See,* Docket 82-84.

On December 11, 2025, Plaintiff filed her Opposition to the Motion for Summary Judgment, primarily relying on the fact that Ms. Myers could not be used as a witness in this case since she had not been disclosed. *See,* Docket 87. The Honorable Magistrate Judgement Docherty then resolved these Motions by granting the Plaintiff's Motion to Extend Discovery and Compelling Defendant to produce Ms. Myers for her deposition. *See,* Docket 113. In light of those rulings, Judge Docherty denied the Motion to Strike as Moot, since the Plaintiff would now have the opportunity to depose Ms. Myers. *See id.*

Ms. Myers' deposition was then held on February 2, 2026. In light of the fact that we now have her deposition testimony, the Court then granted us leave to file this Amended Opposition to Defendant's Motion for Summary Judgment. *See,* Docket 119.

## PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF FACTS

1. On December 6, 2017, Plaintiff entered into a loan with Mariner with a principal balance of $2,539.00 ("2017 Loan").

   **Response: Admitted for purposes of this Motion.**

2. In connection with the 2017 Loan, Plaintiff identified her address as 23 Drummond St., Auburn, NY 13021-2947.

   **Response: Admitted for purposes of this Motion.**

3. The funds for the 2017 Loan were delivered by check to 23 Drummond St., Auburn, NY 13021-2947. *See* **Exhibit 1** (Myers Dec) ¶ 12.

   **Response: Admitted for purposes of this Motion.**

4. During the consummation of the 2017 Loan, Plaintiff supplied a home phone number ending in 5701. *See* Ex. 1 (Myers Dec) ¶ 13.

   **Response: Admitted for purposes of this Motion.**

5. Plaintiff repaid the 2017 Loan through monthly installment payments beginning in 2017 and ending in 2020. *See* Ex. 1 (Myers Dec) ¶ 14.

   **Response: Admitted for purposes of this Motion.**

6. Throughout the life of the loan, Mariner had numerous telephone conversations with Plaintiff. *See* Ex. 1 (Myers Dec) ¶ 15.

   **Response: Admitted for purposes of this Motion.**

7. Plaintiff repaid the 2017 Loan in full on June 15, 2020. *See* Ex. 1-A (2017 Loan).

   **Response: Admitted for purposes of this Motion.**

8. The 2017 Loan appeared on Plaintiff's credit report, reporting as paid-as agreed with a zero balance. *See* **Exhibit 2** (2023 Equifax Credit Report); **Exhibit 3** (2023 Experian Credit Report); **Exhibit 4** (2023 Trans Union Credit Report).

   **Response: Admitted.**

9. At her deposition, Plaintiff admitted that the 2017 Loan was obtained by her, and not by her mother, Deanna Taylor. *See* **Exhibit 5,** 103:19-106:7 (Taylor Depo.)

   **Response: Admitted.**

10. Plaintiff applied for another loan from Mariner on June 22, 2019. *See* Ex. 1 (Myers Dec) ¶ 17.

    **Response: Plaintiff objects to this fact as immaterial, as there is zero indication that this fact was considered during any of Defendant's so called 'investigations' into Ms. Taylor's disputes.**

11. However, Plaintiff did not complete the paperwork and no loan was consummated at that time. *See* Ex. 1 (Myers Dec) ¶ 18.

    **Response: Plaintiff objects to this fact as immaterial, as there is zero indication that this fact was considered during any of Defendant's so called 'investigations' into Ms. Taylor's disputes.**

12. On December 3, 2020, Mariner entered into another loan with Plaintiff, or a borrower using Plaintiff's name and information (the "2020 Loan"). *See* Ex. 1-C (2020 Loan).

**Response: Plaintiff denies entering into any loan with Mariner in December 2020. *See,* Plaintiff's Response to Mariner's Interrogatories, attached as Exhibit C, Response to Interrogatories 4 and 5. Instead, that account was opened by Deanna Taylor, Plaintiff's mother, for her travel agency business, without the Plaintiff's knowledge or authorization. *See,* Declaration of Deanna Taylor, attached as Exhibit D; Transcript of Plaintiff's Deposition, attached as Exhibit E, 104:17 – 105:24.**

13. The funds for the 2020 Loan were delivered by check to 23 Drummond St., Auburn, NY 13021-2947. *See* Ex. 1 (Myers Dec) ¶ 20.

**Response: Plaintiff objects to this fact as immaterial, as there is zero indication that this fact was considered during any of Defendant's so called 'investigations' into Ms. Taylor's disputes. In fact, Ms. Myers testified that she has zero memory as to whether or not she considered that fact during her investigations. *See,* Transcript of Jamie Myers, attached as Exhibit H, 74:24 – 75:5; 77:4-18.**

14. During the consummation of the 2020 Loan, the same phone number used for the 2017 Loan (ending in 5701) was supplied as the borrower's home phone number. *See* Ex. 1-C.

**Response: Plaintiff objects to this fact as immaterial, as there is zero indication that this fact was considered during any of Defendant's so called 'investigations' into Ms. Taylor's disputes. In fact, Ms. Myers testified that she has zero memory as to whether or not she considered that fact during her investigations. *See,* Exhibit H, 74:24 – 75:5; 77:4-18.**

15. Mariner's records reflect numerous telephone conversations with the borrower at the number ending in 5701 throughout the life of the 2020 Loan. *See* Ex. 1 (Myers Dec) ¶ 23.

**Response: Plaintiff objects to this fact as immaterial, as there is zero indication that this fact was considered during any of Defendant's so called 'investigations' into Ms. Taylor's disputes. In fact, Ms. Myers testified that she has zero memory as to whether or not she considered that fact during her investigations. *See,* Exhibit H, 75:6-15.**

16. The 2020 Loan was repaid on time and in full as of April 3, 2024. *See* Ex. 1 (Myers Dec) ¶ 24; *see also* Ex. 1-C.

**Response: Plaintiff objects to this fact as immaterial, as there is zero indication that this fact was considered during any of Defendant's so called**

**'investigations' into Ms. Taylor's disputes. In fact, Ms. Myers testified that she has zero memory as to whether or not she considered that fact during her investigations. *See,* Exhibit H, 76:25 – 77:18.**

17. Mariner never reported a delinquency on the 2020 Loan. *See* Ex. 1 (Myers Dec) ¶ 25.

**Response: Admitted.**

18. Plaintiff testified that she learned in July 2019 that her mother was using her identity to take out loans without her consent. Mariner did not know this. *See* Taylor Depo. 68:21-69:12.

**Response: Plaintiff does not dispute that "she learned in July 2019 that her mother was using her identity to take out loans without her consent". Plaintiff objects to the statement "Mariner did not know this" as supported by zero cited supporting evidence whatsoever.**

19. Plaintiff testified that she discovered the 2020 Loan when she reviewed her credit report in 2021. *See* Taylor Depo. 107:17-108:13.

**Response: Admitted.**

20. Plaintiff testified that she learned on November 25, 2021, that her mother had taken out the 2020 Loan, as well as the Discover and JPMorgan credit cards, using her identity. *See* Taylor Depo. 107:17-108:13.

**Response: Admitted.**

21. On November 19 and 20, 2021, Plaintiff placed a generalized fraud dispute on her entire credit file through the credit reporting agencies ("CRAs"). *See* Taylor Depo. 70:17-22.

**Response: Admitted.**

22. The dispute did not claim that the 2020 Loan was the product of identity theft or include an identity theft report. *See* Ex. 1 (Myers Dec) ¶ 26; Ex. 1-E (ACDV).

**Response: Plaintiff objects to this fact as immaterial, as there is zero indication that this fact was considered during any of Defendant's so called 'investigations' into Ms. Taylor's disputes.**

23. In response to the Automated Credit Dispute Verification ("ACDV") forms transmitted to Mariner from the CRAs, Mariner followed its standard procedures for investigating Plaintiff's dispute and responding to the ACDV forms. *See* Ex. 1 (Myers Dec) ¶ 27.

**Response: Plaintiff objects to this fact as unsupported by admissible evidence as the Myers Declaration is a sham affidavit. Moreover, Mariner's**

**corporate deponent testified that Mariner has zero records or knowledge demonstrating that its investigators followed its standard procedures for investigating Plaintiff's dispute. *See,* Exhibit A, 36:23 – 38:13; 47:5 – 48:25; 57:14-21.**

24. Mariner documented the 2020 Loan as "in dispute" pending the completion of its fraud investigation. *See* Ex. 1 (Myers Dec) ¶ 28.

**Response: Plaintiff objects to this fact as unsupported by admissible evidence as the Myers Declaration is a sham affidavit. Moreover, Mariner's corporate deponent testified that Mariner has zero records or knowledge demonstrating what its investigators did to investigate Ms. Myers' disputes, or whether its investigators followed its standard procedures for investigating Plaintiff's dispute. *See,* Exhibit A, 36:23 – 38:13; 47:5 – 48:25; 57:14-21.**

25. Based on Mariner's investigation, Mariner confirmed its current reporting of the account. *See* Ex. 1 (Myers Dec) ¶¶ 29-30; Ex. 1-E (ACDV).

**Response: Plaintiff objects to this fact as unsupported by admissible evidence as the Myers Declaration is a sham affidavit. Moreover, Mariner's corporate deponent testified that Mariner has zero records or knowledge demonstrating what its investigators did to investigate Ms. Myers' disputes, or whether its investigators followed its standard procedures for investigating Plaintiff's dispute. *See,* Exhibit A, 36:23 – 38:13; 47:5 – 48:25; 57:14-21.**

26. Plaintiff has not alleged any violation by Mariner in connection with the 2021 dispute, and instead focuses on her disputes in 2023 and 2024. (*See* Dkt. No. 1.)

**Response: Plaintiff does not dispute that she is not suing over FCRA violations beyond the 2-year Statute of Limitations.**

27. On or about April 14, 2023, Plaintiff filed an FTC identity theft report claiming that the 2020 Loan and accounts with Discover and JPMorgan were the products of identity theft. *See* **Exhibit 7** (April 2023 FTC Identity Theft Report).

**Response: Admitted.**

28. On April 15, 2023, Plaintiff filed a police report with the Seneca Falls Police Department to report the alleged identity theft, though she advised she did not wish to press charges against her mother. *See* **Exhibit 8** (April 2023 Police Report).

**Response: Admitted.**

29. On April 16, 2023, the Seneca Falls Police Department closed its investigation and marked Plaintiff's file "CLOSED – PROS. DECLINED." *Id.*

**Response: Admitted.**

30. During her deposition, Plaintiff admitted that although she reported in the FTC identity theft report and police report that she discovered the alleged identity theft in April 2023, she actually discovered it in 2021.

**Response: Admitted.**

31. On or about April 18, 2023, Plaintiff sent letters dated April 12, 2023, to Equifax and Trans Union, disputing the 2020 Loan and the Discover and JPMorgan credit cards as identity theft.

**Response: Admitted.**

32. Plaintiff's April 2023 dispute included copies of Plaintiff's credit report, the FTC report, police report, Social Security Card, and driver's license.

**Response: Admitted.**

33. Mariner received ACDV forms from Equifax and Trans Union in April 2023.

**Response: Admitted.**

34. Mariner's credit compliance manager, Jamie Myers ("Myers") investigated and responded to the April 2023 ACDVs. *See* Ex. 1 (Myers Dec) ¶ 34.

**Response: Plaintiff disputes this fact. Mariner's corporate deponent testified that Mariner has zero records or knowledge demonstrating what its investigators did in response to any of Plaintiff's disputes. *See,* Exhibit A, 36:23 – 38:13; 47:5 – 48:25; 57:14-21. And Ms. Myers herself testified that she has zero knowledge of what she actually did to investigate these April 2023 ACDV's. *See,* Exhibit H, 34:10 – 35:3; 36:21 – 37:13. All Ms. Myers was able**

**to say is that she *would have* followed whatever was the policy and procedure back at that time – although she did not know what those policies and procedures were. *See,* Exhibit H, 37:15 – 38:9. However, Ms. Myers is not a perfect rule follower, and also testified that she *does* make mistakes during the investigations she conducts, and she cannot remember if she did so during the six investigations at issue in this case. *See,* Exhibit H, 89:9-23.**

35. Myers has worked as a credit compliance manager at Mariner for over twenty-three years. *See* Ex. 1 (Myers Dec) ¶ 3.

**Response: Plaintiff does not dispute this fact.**

36. Myers has been certified by the Consumer Data Industry Association. *See* Ex. 1 (Myers Dec) ¶ 4.

**Response: Plaintiff objects to this fact as immaterial.**

37. Myers devoted more time to investigating Plaintiff's dispute than other disputes because it involved identity theft allegations. *See* Ex. 1 (Myers Dec) ¶ 35.

**Response: Plaintiff disputes this fact. The Myers Declaration is a Sham Affidavit – Ms. Myers specifically testified at her deposition that she has no idea how much time she spent investigating any of Plaintiff's disputes. *See,* Exhibit H, 64:6-21; 69:3-23.**

**Moreover, Mariner's corporate deponent further testified that Mariner has zero records or knowledge demonstrating what its investigators did in response to any of Plaintiff's disputes.** ***See,*** **Exhibit A, 36:23 – 38:13; 47:5 – 48:25; 57:14-21.**

38. Myers examined all the information and documents Plaintiff submitted with her disputes to the CRAs. *See* Ex. 1 (Myers Dec) ¶ 36.

**Response: Plaintiff disputes this fact. The Myers Declaration is a Sham Affidavit – Ms. Myers specifically testified at her deposition that she could not say for sure that she actually examined those documents.** ***See,*** **Exhibit H, 69:24 – 70:18.**

**Moreover, Mariner's corporate deponent testified that Mariner has zero records or knowledge demonstrating what its investigators did in response to any of Plaintiff's disputes**. ***See,*** **Exhibit A, 36:23 – 38:13; 47:5 – 48:25; 57:14-21.**

39. During her examination of those documents, Myers noticed inconsistencies between the police report and FTC report. *See* Ex. 1 (Myers Dec) ¶ 37. For example, the police report identified the accounts as stolen, while the FTC report identified them as the product of identity theft by Plaintiff's mother. *See id.*; *see also* Ex. 1-F; Ex. 1-G.

**Response: Plaintiff disputes this fact. The Myers Declaration is a Sham Affidavit – Ms. Myers specifically testified at her deposition that she has no idea if she did these things in response to the April 2023 ACDV's. *See,* Exhibit H, 71:18 – 72:2; 73:1-7.**

**Moreover, Mariner's corporate deponent testified that Mariner has zero records or knowledge demonstrating what its investigators did in response to any of Plaintiff's disputes. *See,* Exhibit A, 36:23 – 38:13; 47:5 – 48:25; 57:14-21.**

40. Myers also reviewed Mariner's records for the 2020 Loan, including the payment history and servicing history. *See* Ex. 1 (Myers Dec) ¶ 38.

**Response: Plaintiff disputes this fact. The Myers Declaration is a Sham Affidavit – Ms. Myers specifically testified at her deposition that she has no idea if she did these things in response to the April 2023 ACDV's. *See,* Exhibit H, 73:8 - 74:10.**

**Moreover, Mariner's corporate deponent testified that Mariner has zero records or knowledge demonstrating what its investigators did in response to any of Plaintiff's disputes. *See,* Exhibit A, 36:23 – 38:13; 47:5 – 48:25; 57:14-21.**

41. This investigation revealed that the 2020 Loan was being actively and timely repaid. *See* Ex. 1 (Myers Dec) ¶ 39.

**Response: Plaintiff disputes this fact. The Myers Declaration is a Sham Affidavit – Ms. Myers herself testified that she has zero knowledge of what she actually did to investigate these April 2023 ACDV's. *See,* Exhibit H, 34:10 – 35:3; 36:21 – 37:13.**

**Moreover, Mariner's corporate deponent testified that Mariner has zero records or knowledge demonstrating what its investigators did in response to any of Plaintiff's disputes. *See,* Exhibit A, 36:23 – 38:13; 47:5 – 48:25; 57:14-21.**

42. Myers also examined Mariner's broader file about its business relationships with Plaintiff. *See* Ex. 1 (Myers Dec) ¶ 40. She learned that Plaintiff had a previous loan with Mariner in 2017, which was also timely and fully repaid. *Id.* Mariner had no record of receiving any credit disputes regarding the 2017 Loan. *Id.*

**Response: Plaintiff disputes this fact. The Myers Declaration is a Sham Affidavit – Ms. Myers herself testified that she has zero knowledge of whether she actually did this to investigate these April 2023 ACDV's. *See,* Exhibit H, 74:11-22.**

**Moreover, Mariner's corporate deponent testified that Mariner has zero records or knowledge demonstrating what its investigators did in response to any of Plaintiff's disputes. *See,* Exhibit A, 36:23 – 38:13; 47:5 – 48:25; 57:14-21.**

43. This investigation revealed that the 2017 Loan and the 2020 Loan were consummated by mail at the same address and the borrower provided the same home phone number for both loans. *See* Ex. 1 (Myers Dec) ¶ 41.

**Response: Plaintiff disputes this fact. The Myers Declaration is a Sham Affidavit – Ms. Myers herself testified that she has zero knowledge as to whether or not this statement is actually true. *See,* Exhibit H, 74:24 – 75:5.**

**Moreover, Mariner's corporate deponent testified that Mariner has zero records or knowledge demonstrating what its investigators did in response to any of Plaintiff's disputes. *See,* Exhibit A, 36:23 – 38:13; 47:5 – 48:25; 57:14-21.**

44. The investigation also revealed that during the life of both the 2017 and 2020 Loan, Mariner spoke with Plaintiff by phone on numerous occasions, including in 2019 and 2021. *See* Ex. 1 (Myers Dec) ¶ 42. There is no record of Plaintiff claiming identity theft during these calls. *Id.*

**Response: Plaintiff disputes this fact. The Myers Declaration is a Sham Affidavit – Ms. Myers herself testified that she has zero knowledge as to whether or not this statement is actually true. *See,* Exhibit H, 75:6-15.**

**Moreover, Mariner's corporate deponent testified that Mariner has zero records or knowledge demonstrating what its investigators did in response to any of Plaintiff's disputes. *See,* Exhibit A, 36:23 – 38:13; 47:5 – 48:25; 57:14-21.**

45. Mariner was not informed of any potential identity theft until years after the 2020 Loan was opened and after years of timely payments, which from Myers' perspective, would not be typical for an account involving identity theft. Ex. 1 (Myers Dec) ¶ 43.

**Response: Plaintiff disputes this fact. The Myers Declaration is a Sham Affidavit – Ms. Myers herself testified that she has zero knowledge as to whether or not she actually considered these facts or knew these facts when investigating these disputes. *See,* Exhibit H, 75:17 – 76:7.**

**Moreover, Mariner's corporate deponent testified that Mariner has zero records or knowledge demonstrating what its investigators did in response to any of Plaintiff's disputes. *See,* Exhibit A, 36:23 – 38:13; 47:5 – 48:25; 57:14-21.**

46. Myers recognized that Plaintiff identified a different telephone number and address in connection with the April 2023 Dispute. *See* Ex. 1 (Myers Dec) ¶ 44. However, she did not believe that this explained the active repayment history or similarities between the 2020 Loan and the 2017 Loan. *Id.*

**Response: Plaintiff disputes this fact. The Myers Declaration is a Sham Affidavit – Ms. Myers herself testified that she has zero knowledge as to whether or not this statement is actually true. *See,* Exhibit H, 77:9-23.**

**Moreover, Mariner's corporate deponent testified that Mariner has zero records or knowledge demonstrating what its investigators did in response to**

**any of Plaintiff's disputes. *See,* Exhibit A, 36:23 – 38:13; 47:5 – 48:25; 57:14-21.**

47. As a result of her investigation, Myers concluded that Plaintiff was responsible for the 2020 Loan. Ex. 1 (Myers Dec) ¶ 45.

**Response: Plaintiff disputes this fact. The Myers Declaration is a Sham Affidavit – Ms. Myers herself testified that she has zero knowledge as to whether or not this statement is actually true. *See,* Exhibit H, 76:25 – 77:18.**

**Moreover, Mariner's corporate deponent testified that Mariner has zero records or knowledge demonstrating what its investigators did in response to any of Plaintiff's disputes. *See,* Exhibit A, 36:23 – 38:13; 47:5 – 48:25; 57:14-21.**

48. This conclusion was based in part on the active and current payment history for the 2020 Loan, Plaintiff's 2017 Loan, Plaintiff's prior association with the address and phone number used for the 2020 Loan, and calls with the borrower during which there was no suggestion of identity theft. Ex. 1 (Myers Dec) ¶ 46.

**Response: Plaintiff disputes this fact. The Myers Declaration is a Sham Affidavit – Ms. Myers herself testified that she has zero knowledge as to whether or not this statement is actually true. *See,* Exhibit H, 76:25 – 77:18.**

**Moreover, Mariner's corporate deponent testified that Mariner has zero records or knowledge demonstrating what its investigators did in response to**

**any of Plaintiff's disputes. *See,* Exhibit A, 36:23 – 38:13; 47:5 – 48:25; 57:14-21.**

49. Myers escalated the investigation to her supervisor, Kellye Mull ("Mull"). *See* Ex. 1 (Myers Dec) ¶ 47.

**Response: Plaintiff disputes this fact. The Myers Declaration is a Sham Affidavit – Ms. Myers herself testified that she has zero knowledge as to whether or not this statement is actually true. *See,* Exhibit H, 77:20 – 78:7.**

**Moreover, Mariner's corporate deponent testified that Mariner has zero records or knowledge demonstrating what its investigators did in response to any of Plaintiff's disputes. *See,* Exhibit A, 36:23 – 38:13; 47:5 – 48:25; 57:14-21.**

50. Mull is the Vice President of Credit Reporting & Disputes at Mariner and has held that position for over thirty-four years. *Id.*

**Response: Plaintiff objects to this fact as immaterial, as there is zero evidence that Ms. Mull was involved in the investigation of these disputes. Ms. Myers expressly testified that she has zero knowledge as to whether or not she ever involved Ms. Mull in these disputes. *See,* Exhibit H, 77:20 – 78:7.**

51. Mull found no reason to change the result of Myers' investigation. *See* Ex. 1 (Myers Dec) ¶ 48.

**Response: Plaintiff disputes this fact. The Myers Declaration is a Sham Affidavit – Ms. Myers herself testified that she has zero knowledge as to whether or not this statement is actually true. *See,* Exhibit H, 77:20 – 78:7.**

**Moreover, Mariner's corporate deponent testified that Mariner has zero records or knowledge demonstrating what its investigators did in response to any of Plaintiff's disputes. *See,* Exhibit A, 36:23 – 38:13; 47:5 – 48:25; 57:14-21.**

52. Mariner reported the results of its investigation to the CRAs, indicating that the information Mariner had furnished about the 2020 Loan was accurate but disputed by the consumer. *See* Ex. 1 (Myers Dec) ¶ 49.

**Response: Plaintiff does not dispute this fact.**

53. On September 20, 2023, Plaintiff filed another FTC identity theft report repeating her claim that the 2020 Loan and accounts at Discover and JPMorgan were all the products of identity theft.

**Response: Admitted.**

54. Mariner attempted to contact Plaintiff via telephone on September 28, 2023. On September 29, 2023, an individual purporting to be Plaintiff called Mariner from the phone number ending in 5701. Mariner returned that call on September 29, 2023, but there was no answer. *See* Ex. 1 (Myers Dec) ¶ 50.

**Response: Plaintiff disputes this fact as immaterial, as there is zero evidence or indication that this fact was considered during the course of Mariner's investigations into Plaintiff's disputes.**

55. On or about September 29 and October 8, 2023, Plaintiff sent letters dated September 22, 2023, to Equifax, disputing the 2020 Loan and the Discover and JPMorgan credit cards as identity theft (together, the "Fall 2023 Disputes").

**Response: Admitted.**

56. Mariner received two ACDV forms from Equifax in October 2023.

**Response: Admitted.**

57. In response to the October 2023 ACDV forms, Myers examined the Fall 2023 Disputes and information provided by Plaintiff. *See* Ex. 1 (Myers Dec) ¶ 53.

**Response: Plaintiff disputes this fact. The Myers Declaration is a Sham Affidavit – Ms. Myers herself testified that she has zero knowledge as to whether or not this statement is actually true. *See,* Exhibit H, 78:18 – 79:11.**

**Moreover, Mariner's corporate deponent testified that Mariner has zero records or knowledge demonstrating what its investigators did in response to any of Plaintiff's disputes. *See,* Exhibit A, 36:23 – 38:13; 47:5 – 48:25; 57:14-21.**

58. Ms. Myers found no reason to doubt the validity of the conclusions reached during her prior investigation. *See id.*

**Response: Plaintiff disputes this fact. The Myers Declaration is a Sham Affidavit – Ms. Myers herself testified that she has zero knowledge as to whether or not this statement is actually true. *See,* Exhibit H, 78:18 – 79:11.**

**Moreover, Mariner's corporate deponent testified that Mariner has zero records or knowledge demonstrating what its investigators did in response to any of Plaintiff's disputes. *See,* Exhibit A, 36:23 – 38:13; 47:5 – 48:25; 57:14-21.**

59. Therefore, Mariner reported to the CRAs that the information Mariner had furnished about the 2020 Loan was accurate but disputed by the consumer. *See* Ex. 1 (Myers Dec) ¶ 54; *see also* Ex. 1-E (ACDV).

**Response: Plaintiff does not dispute this fact.**

60. On or about April 11 and 16, 2024, Plaintiff sent letters dated April 4, 2024, to Equifax and Trans Union, respectively, claiming that the 2020 Loan and accounts at Discover and JPMorgan were all the products of identity theft.

**Response: Admitted.**

61. Mariner received ACDV forms from Equifax and Trans Union in April 2024.

**Response: Admitted.**

62. In response to the April 2024 ACDV forms, Myers examined Plaintiff's disputes and the information provided by Plaintiff. *See* Ex. 1 (Myers Dec) ¶ 57. Ms. Myers found no reason to doubt the validity of the conclusions reached during her prior investigation. *See id.*

**Response: Plaintiff disputes this fact. The Myers Declaration is a Sham Affidavit – Ms. Myers herself testified that she has zero knowledge as to whether or not this statement is actually true. *See,* Exhibit H, 79:12 – 80:3.**

**Moreover, Mariner's corporate deponent testified that Mariner has zero records or knowledge demonstrating what its investigators did in response to any of Plaintiff's disputes. *See,* Exhibit A, 36:23 – 38:13; 47:5 – 48:25; 57:14-21.**

63. Therefore, Mariner reported to the CRAs that the information Mariner had furnished about the 2020 Loan was accurate but disputed by the consumer. *See* Ex. 1 (Myers Dec) ¶ 58; *see also* Ex. 1-E (ACDV).

**Response: Admitted.**

64. Plaintiff claims that Mariner violated 15 U.S.C. § 1681s-2(b) for failing to conduct a reasonable investigation in response to her April 2023, November 2023, and April 2024 credit disputes. (Dkt. No. 1, ¶¶ 106-112.)

**Response: Admitted.**

65. Plaintiff seeks to recover, among other damages, actual damages, including harm to her credit score and the resulting impact on her ability to obtain credit. (*See id.*, ¶¶ 3-5.)

**Response: Admitted.**

66. Plaintiff's alleged injuries are limited to her "stress[], anger, annoy[ance], and frustrat[ion]" during this time. *See* **Exhibit 10**, at 9-10 (Plaintiff's Response to Mariner's Interrogatories).

**Response: Denied. Nowhere in the cited materials does the Plaintiff state that her injuries are "limited to her stress, anger, annoyance, and frustration" as Defendant claims. In those responses, Plaintiff did respond, in part, that "Plaintiff also suffered great distress, anger, annoyance and frustration in her daily life, which she should not have to deal with, and was subjected to abusive credit reporting practices which Plaintiff had a substantive right to be free from." As her attached Declaration makes clear, that is not the limit of her emotional distress damages.**

67. Plaintiff testified that she does not attribute any of her alleged credit damages to Mariner's reporting of the 2020 Loan. *See* Taylor Depo. 109:24-110:6.

**Response: Plaintiff denies and objects to this statement, as it does not accurately reflect the cited testimony, wherein Plaintiff only testified that she didn't believe the Mariner account was bringing her credit score down.**

68. Plaintiff received no credit monitoring notifications that her credit score was harmed by any information Mariner furnished to the CRAs.

**Response: Admitted.**

69. Conversely, Plaintiff's credit score decreased when Discover and JPMorgan reported delinquencies with respect to the credit card accounts. *See* **Exhibit 11** (March 2024 Equifax Credit Report); **Exhibit 12** (March 2024 Experian Credit Report); **Exhibit 13** (March 2024 Trans Union Credit Report)

**Response: Plaintiff denies and objects to this statement, as the cited materials – just a one-month credit report from each credit bureau, which cannot possibly show upward or downward movement of a credit score, which occurs over a period of at least 2 months - do not support this statement.**

70. Plaintiff's credit score held steady in the mid-to-high 600s before dropping precipitously into the 500s when Discover and Chase began furnishing information about payment delinquencies in November and December 2022. *See* **Exhibit 6** (Discover statements); *see also* Ex. 2; Ex. 3; Ex. 4.

**Response: Plaintiff denies and objects to this statement, as the cited materials do not support this statement.**

71. Although Plaintiff had approximately five visits with a psychologist through her employee assistance program in or around May 2024, she did not speak with any

healthcare providers about Mariner nor seek treatment for any emotional distress when Mariner responded to her credit disputes. *See* Taylor Depo. 93:8-20, 95:10-13, 111:14-19.

**Response: Plaintiff denies and objects to this statement, as the cited materials do not support these statements, other than the statement that "Plaintiff did not speak with any healthcare providers about Mariner."**

72. In or around September 2021, and before the credit disputes and reporting that Plaintiff complains of in this case, Plaintiff visited her primary care physician and was prescribed antidepressants "to help address her emotional distress." *See* Ex. 10, at 10-11.

**Response: Denied. While Plaintiff admits that she visited her primary care physician and was prescribed anti-depressants in September 2021, this was *after* she discovered the reporting of the Mariner account on her credit report, which she discovered in *August 2021. See,* Exhibit E, 99:21-24.**

73. During her deposition, Plaintiff did not attribute any of her alleged emotional distress to Mariner. *See* Taylor Depo. 40:7-19; 93:8-95:9.

**Response: Plaintiff objects to this statement which is misleading. At her deposition, Mariner *never once asked the Plaintiff to describe her injuries, harm or damages,* so the Plaintiff was never given an opportunity to describe the intense emotional distress she suffered as a result of Mariner's actions. As her**

**attached Declaration makes clear, she absolutely does attribute her emotional distress to Mariner.**

74. Rather, Plaintiff attributed her emotional distress to a rift with her mother, damage to her credit caused by Discover and JPMorgan, and the stress associated with moving to a different state. *See* Taylor Depo. 40:7-19; 93:8-95:9.

**Response: Plaintiff objects to this statement which is misleading. At the cited portions of the transcript, Plaintiff testified that her mother's actions had traumatized her and Defendant's counsel then asked "I'd like to go into that a little bit more." Mariner *never once asked the Plaintiff to describe her injuries, harm or damages,* so the Plaintiff was never given an opportunity to describe the intense emotional distress she suffered as a result of Mariner's actions. As her attached Declaration makes clear, she absolutely does attribute her emotional distress to Mariner.**

## PLAINTIFF'S ADDITIONAL STATEMENT OF FACTS

75. The subject Mariner account was a 'loan-by-mail' account, which means that a consumer receives a loan offer from Mariner in the form of a check that is attached with loan disclosures, which they choose to accept by cashing or depositing the check. *See,* Exhibit A, 10:17 – 11:12.

76. The Mariner loan by mail check – which resulted in the subject Mariner loan being opened - was deposited in a checking account belong to a travel agency named

"Finger Lakes Travel." *See,* Exhibit A, 14:1-17; *see also,* Copy of Deposited Check, attached as Exhibit F.

77. The deposited check also had Deanna Taylor's phone number listed on it, ending in 5701. *See,* Exhibit A, 14:18-23; Exhibit F.

78. Ms. Taylor disputed the reporting of the Mariner account 6 separate times via the credit bureaus, twice on November 20, 2021, 1 on April 27, 2023, 1 on May 3, 2023, 1 on April 17, 2024, and 1 on April 25, 2024. *See,* Exhibit A, 31:1-11; 46:21 – 47:4; 73:14-25.

79. In connection with her disputes submitted in 2023, Ms. Taylor submitted FTC Identity Theft Reports, advising Mariner that her mother Deanna Taylor had opened this account to support her struggling travel agency business, and providing her phone number, along with Deanna Taylor's phone number ending in 5701. *See,* Exhibit A, 89:3-11.

80. Deanna Taylor admitted under oath to opening up this Mariner account in Plaintiff's name without Plaintiff's approval or knowledge. *See,* Exhibit D.

81. Mariner's investigators never called Deanna Taylor to confirm what Plaintiff was telling them – that Deanna Taylor, and not the Plaintiff, had opened this account. *See,* Exhibit A, 86:7-11; 89:12-20.

82. Other than a brief notation such as the control number and response code, Mariner's business records contain zero notations as to what its investigators did during the course of the investigations into Ms. Taylor's disputes. *See,* Exhibit A, 29:3-11; 47:5-21.

83. Mariner therefore has no way to go back and look at the steps that its investigators undertook into Plaintiff's disputes. *See,* Exhibit A, 48:15 – 49:4.

## ARGUMENT

### A. Summary Judgment Is Not Warranted On Mariner's Claim That Its Investigations Were Reasonable As A Matter Of Law.

Defendant cannot possibly move for summary judgment on the reasonableness of its investigations into Plaintiff's disputes, when there is *zero* admissible evidence in the record as to what those investigations entailed. Defendant's business records contain zero indication as to what its investigators did, when investigating Ms. Taylor's disputes in 2021, 2023 or 2024. That is why Mariner bases its entire narrative of these 'investigations' on the 10-page, 58-paragraph surprise Declaration from Jamie Myers. *See,* Docket 74-1.

The problem for Mariner – now that we had the opportunity to cross-examine Ms. Myers at her deposition – is obvious: Ms. Myers repeatedly testified that she does not have actual knowledge of the statements that were contained in the Declaration that was written up for her and that she then signed. *See,* Exhibit H, 101:4-24; 66:14-21; 49:15 – 50:25. At her deposition, we painstakingly went through Ms. Myers' Declaration with her, read her the verbatim Paragraphs that Defendant cites to, and then asked her whether she actually knows if those sworn-to statements are true. Without fail, she testified that she has no knowledge of the accuracy of those statements, given the intervening passage of time between the 2023 and 2024 disputes and when she signed the Declaration in November 2025. *See e.g.,* Exhibit H, 69:24 – 70:18; 71:18 – 72:2; 73:1-7; 73:8 - 74:10; 74:11-22; 74:24 – 75:5; 77:9-23; 76:25 – 77:18; 77:20 – 78:7; 78:18 – 79:11; 79:12 – 80:3.

Ms. Myers expressly testified that – even if she was presented with all of Mariner's records – she *still* wouldn't be able to recall what she did back then, because those records simply do not contain that information. *See,* Exhibit H, 81:18 – 81:24; 82:13-22. This makes sense considering Ms. Myers carried out these investigations 2-3 years ago and has zero records as to what she did to investigate these disputes. *See,* Exhibit H, 66:2-21. What does **not** make sense, however, is how the Defendant can continue to claim compliance with its duties of candor to the Court, without withdrawing the Myers' Declaration that it relies on so heavily, given that she has now readily admitted that she has zero knowledge of the statements that she swore to in her Declaration.

In any event, a movant simply cannot obtain summary judgment based on a Declaration from a witness who lacks the personal knowledge of the statements that are sworn to in that Declaration. FRCP 56 is very clear on that point: "An affidavit or declaration used to support or oppose a motion **must be made on personal knowledge**, set out facts that would be admissible in evidence**, and show that the affiant or declarant is competent to testify on the matters stated**." FRCP 56(c)(4)(emphasis added). S*ee also, Jain v. CVS Pharmacy, Inc.*, 779 F.3d 753, 758 (8th Cir. 2015) (finding the district court did not err in striking a declaration because it was not based on personal knowledge); *El Deeb v. Univ. of Minn.*, 60 F.3d 423, 428 (8th Cir. 1995)("Affidavits asserting personal knowledge must include enough factual support to show that the affiant possesses that knowledge"). Here, Ms. Myers has expressly testified to the fact that she lacks the personal knowledge to know whether or not the statements in her Declaration are true. Her Declaration therefore plainly cannot be used as a basis to grant summary judgment on.

Without the Myers Declaration, Defendant has literally *nothing* to support its claims about what its investigations consisted of, and is therefore unable to obtain summary judgment on the reasonableness of these unknown investigations. As the Southern District of New York recently noted in another FCRA case, "an investigation will not be deemed sufficient without at least some evidence of what the investigation *actually entailed*." *Owoyemi v. Credit Corp Sols. Inc.*, 2023 WL 4053134, at *9 (S.D.N.Y. June 16, 2023). The *Owoyemi,* court found that a question of fact existed as to whether the investigation was reasonable, because the defendant only supported its version of the events with a Declaration from its Litigation Manager, who lacked "any direct involvement in the investigation". *Id.,* citing *Jenkins v. Capital One, N.A.,* 2017 WL 1323812, at *7 (E.D.N.Y. Feb. 28, 2017)(denying summary judgment because "Defendant's responses do not detail the exact nature and scope of Capital One's investigation, and Defendant has offered no testimony – either by deposition, affidavit, or otherwise – from any Capital One employee involved in investigating Plaintiff's disputes"); *Dickman v. Verizon Communications, Inc.*, 876 F. Supp.2d 166, 173-74 (E.D.N.Y. 2012) (finding that the existence of ACDVs and testimony from a furnisher's employee who did not actually create the ACDVs were "deficien[t]" to show that the furnisher conducted a reasonable investigation); *Martinez v. Celtic Bank*, 2024 U.S. Dist. LEXIS 42587, at *28 (S.D.N.Y. Mar. 8, 2024)(similarly denying summary judgment where no testimony was submitted from the actual investigator of the credit reporting dispute, because "**if no one can testify to what the investigations actually entailed, there is a fact dispute about whether any investigation that did occur was reckless**").

Summary judgment was similarly denied to the furnisher defendant, for this same reason, in *Williams v. Experian Info. Sols., Inc.,* 2024 U.S. Dist. LEXIS 26852 (W.D. Wash. Feb. 15, 2024). In that action, the furnisher attempted to support a Motion for Summary Judgment on the reasonableness of its investigations by pointing to the testimony from its corporate deponent. The *Williams* court found that summary judgment could not be based on such testimony, holding:

> Nationstar relies on its corporate witness, Trompisz, to support its argument that its investigation into each dispute was reasonable. But Trompisz lacks personal knowledge of what was reviewed and **based her conclusions about the scope of each investigation solely on her presumption that the Nationstar employees who responded followed procedures**.
>
> There are no records or evidence showing what investigation was actually performed. Instead, Nationstar simply points to the fact that they provided a response to the CRAs. But there is no affirmative evidence in the record showing what the investigation was and whether it was reasonable. This fatal to Nationstar's Motion. A jury must determine whether Nationstar's investigation was inadequate, which appears to require some assessment of whether Nationstar's corporate witness is believable as what the other Nationstar employees may or may not have done to investigate the disputes. On the record before it, the Court cannot reach only one conclusion about the conduct's reasonableness.
>
> *Williams*, 2024 U.S. Dist. LEXIS 26852, at *16-17.

In this case, Ms. Myers' Declaration plainly cannot be considered at Summary Judgment, since she has subsequently testified that she has no idea whether any of the statements in that Declaration are indeed true. This means that the sole <u>admissible</u> evidence of what Defendant did on all these various investigations comes from the deposition testimony of Mariner's corporate deponent, Brent Nau. However, Mr. Nau testified that he never spoke to Jamie Myers, the individual whom he believed *may* have

carried out the investigations into each of Ms. Taylor's disputes. *See,* Exhibit A, 32:13-19. While Mr. Nau testified that Mariner's *practice* is to have its investigators review supporting documents in connection with a dispute investigation, Mr. Nau had no idea if Mariner's dispute investigator *actually did so* in connection with the Plaintiff's disputes. *See,* Exhibit A, 57:14 – 58:15. Instead, Mr. Nau candidly admitted that he wasn't a part of these dispute investigations and therefore could not say what exactly was done by Mariner's investigators during those investigations. *See,* Exhibit A, 77:22 – 78:6; 37:21 – 38:13.

As the holdings in *Martinez, Williams, Owoyemi, Dickman* and *Jenkins* all concluded, summary judgment is simply not warranted here. If we are to truly evaluate whether or not Mariner complied with its obligations under the FCRA in conducting these investigations – without the jury getting to weigh the credibility of the witnesses - we ought to at least hear *from the person who actually did those investigations*. Instead, all we have here is (1) the Declaration of Ms. Myers, a witness with zero knowledge at all, and (2) deposition testimony from a professional witness who had nothing to do with these dispute investigations, has no idea what was actually done for these investigations, or even the identities of the people who did do these investigations. That cannot possibly be enough to warrant throwing Ms. Taylor's claims out without an evidentiary hearing, and preventing her from even having a chance to prove her case at trial.

Even if the Defendant had properly supported its Motion for Summary Judgment with testimony from a witness with actual knowledge of these investigations, summary judgment would still not be warranted as a reasonable jury could easily find that Mariner's

investigators should have done more here. In this case, Mariner does not contend that the Plaintiff actually filled out a loan application; instead, they extended the fraudulent loan all by mailing a check to Ms. Taylor's former home (where Deanna Taylor, her mother, lived). The account was effectively opened by the back of the check being signed, and by the loan check being deposited. *See*, Exhibit A, 10:17 – 11:12. Mariner turned over a copy of that deposited check, which plainly reflects that **it was deposited into the bank account for 'Finger Lakes Travel', a travel agency owned by Deanna Taylor.** See, Exhibit A, 14:1-17; see also, Exhibit F. In the Plaintiff's FTC Affidavits submitted with her disputes, she expressly informed Mariner that her mother had opened this account in order to keep her travel agency afloat. *See,* Exhibit A, 89:3-11; FTC Affidavit, attached as Exhibit G. The Plaintiff also provided Deanna Taylor's phone number ending in 5701 with her disputes, which matched the phone number on the back of the Mariner check deposited into the Finger Lakes Travel account. *See id.* And yet, despite the glaring fact that the account-opening check had been deposited into a travel agency bank account not affiliated with the Plaintiff, *nobody at Mariner bothered to call Deanna Taylor at that phone number to see if she would deny what the Plaintiff was telling them*.

These facts are what make this readily distinguishable from the holding of *Suluki v. Credit One Bank*, 138 F.4th 709 (2d Cir. 2025) repeatedly cited in Mariner's motion. In that case, as here, the plaintiff alleged that her mother had opened the subject account without her consent or authorization. But that is where the similarities end. In *Suluki,* an investigator from Credit One **did** speak to the debtor's mother after the supposed fraud was reported, who then told Credit One that the account was not fraudulent and that "she and

Suluki opened the account together when Suluki was in college, with the understanding that [Suluki's mother] would make payments on the card to assist Suluki with building her credit. [Suluki's mother told the representative that there was no forgery or fraud, that she had been paying the amount due every month, and would remain responsible for paying off the account balance." *Id.,* at 715. The district court found that, on these facts, Credit One's investigation was not unreasonable because "Suluki has pointed to no one who can corroborate her testimony that her mother did not have her permission to open the account, nor has she proffered any piece of evidence that would show she did not give that permission, if Credit One had only retained it or sought it out." *Suluki v. Credit One Bank, N.A.*, 666 F. Supp. 3d 403, 414 (S.D.N.Y. 2023). The Second Circuit then affirmed this reasoning of the district court.

In reaching this conclusion, however, the *Suluki* court distinguished prior holdings from that had come out the opposite way. For example, the *Suluki* court rejected the plaintiff's reliance on the holding of *Wood v. Credit One Bank*, 277 F. Supp. 3d 821 (E.D. Va. 2017), because in *Wood* – and ***like here*** **-** the identity thief in *Wood* **confessed that the card belonged to her, not the plaintiff.** Specifically, the *Wood* plaintiff "submitted an affidavit from his mother, Dyan Lollis, certifying that the Credit One credit card was opened against the will of David Wood, but instead by Dyan Lollis, and stating that she wished to have it transferred back to the rightful owner Dyan Lollis." *Suluki*, 666 F. Supp. 3d 403, 411, quoting *Wood,* 277 F. Supp. 3d at 849. That is **exactly** what we have in this case, where Deanna Taylor has sworn under oath that she opened this account in the Plaintiff's name without her permission. *See,* Exhibit D.

Under the FCRA, furnishers cannot perform a cursory 'investigation' and thereby comply with their obligations under the statute. Instead, most courts – including in this District – assume that that the investigation required by the FCRA must be 'reasonable'. *See e.g., Johnson v. Freedom Mortg. Corp.*, No. 21-cv-2760 (KMM/ECW), 2024 U.S. Dist. LEXIS 136151, at *11 (D. Minn. Aug. 1, 2024); *SimmsParris v. Countrywide Fin. Corp.,* 652 F.3d 355, 359 (3d Cir. 2011); *Gorman v. Wolpoff & Abramson, LLP,* 584 F.3d 1147, 1157 (9th Cir. 2009); *Westra v. Credit Control of Pinellas,* 409 F.3d 825, 827 (7th Cir. 2005); *Johnson v. MBNA Am. Bank, NA,* 357 F.3d 426, 432 (4th Cir. 2004). In rejecting a furnisher's argument that the FCRA "imposes only a minimal duty on creditors to briefly review their records to determine whether the disputed information is correct", the Fourth Circuit clarified that:

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); *see* Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry"). Thus, the plain meaning of "investigation" clearly requires some degree of careful inquiry by creditors. Further, § 1681s–2(b)(1)(A) uses the term "investigation" in the context of articulating a creditor's duties in the consumer dispute process outlined by the FCRA. It would make little sense to conclude that, in creating a system intended to give consumers a means to dispute—and, ultimately, correct—inaccurate information on their credit reports, Congress used the term "investigation" to include superficial, *un*reasonable inquiries by creditors.

*Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 430–31 (4th Cir. 2004); *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1302–03 (11th Cir. 2016)(same).

Thus, the law is clear that a careful, searching inquiry is what the law requires – not some sort of cursory review of a consumer's dispute. In this case, Mariner's duty to conduct a reasonable investigation was triggered each time the Plaintiff submitted her

disputes to the credit reporting agencies. In each of those disputes, the Plaintiff would very clearly state that she never opened this account, and that this account had been fraudulently opened by her mother, Deanna Taylor. Mariner knew *exactly* how to reach Deanna Taylor because the Plaintiff gave them Deanna's phone number, which was the exact phone number they *already* had on file for the subject account[2]. Yet, ***Mariner never bothered to contact Deanna Taylor to attempt to investigate the Plaintiff's claims that Deanna had opened this account***. *See,* Exhibit A, 86:7-11; 89:12-20. Moreover, Mariner's witness testified that Mariner records all of its calls where payments are made, and the account reflects many such calls. *See id.*, 23:14 – 24:9. Mariner's witness testified that Mariner would keep those recordings. *See id.* Plaintiff's disputes provided Mariner with Plaintiff's phone number – in addition to Deanna Taylor's number – so Mariner could easily have called each of those 2 individuals to see whose voice resembled the voice on those recordings as well.

Even if Mariner had substantiated its investigations with admissible evidence – and here they did not - Mariner is not entitled to summary judgment on the reasonableness of its investigations here, given the gaping holes in those investigations. A "reasonable investigation" is one "that a reasonably prudent person would undertake under the

---

[2] In a footnote, Defendant claims that contacting third parties during an investigation could put it in a Catch 22 situation. Nonsense – all Plaintiff was asking was for Mariner *to call the phone number it already had on file on this account,* so they could confirm with their own customer that Plaintiff had not opened this account. Moreover, this is clearly a red herring: unlike the debt collector defendant in Defendant's cited case of *Rosa v. Mandarich Law Grp., LLP*, 2023 U.S. Dist. LEXIS 122911 (S.D.N.Y. July 17, 2023), Defendant is not a debt collector, and therefore is not subject to compliance with the FDCPA. It has zero legitimate concerns of therefore running afoul of that statute.

circumstances." *Seamans v. Temple Univ.*, 744 F.3d 853, 864-64 (3d Cir.2014). Mariner plainly failed to do what a reasonably prudent person would do in this situation.

Consider this straightforward scenario: a shopkeeper notices that some pricey wine bottles had disappeared after 2 familiar customers left his store. The shopkeeper calls the police, who immediately respond to the scene and arrest one of those customers. The detained customer advises the police that he did not purloin the pricey booze, but that he had personally seen the other customer do so. Clearly a reasonable investigator in that scenario would at least contact that other customer, to at least *ask* whether he had perhaps walked off with the bottle without realizing that he had forgotten to pay for it[3].

The exact same logic applies to this case. It is respectfully submitted that a 'reasonably prudent person' whose job it is to 'investigate' a claim of unauthorized charges would at least *reach out to the identified suspect* in order to at least see if those claims are corroborated or denied. *See, Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016)("when a furnisher does not already possess evidence establishing that an item of disputed information is true, § 1681s-2(b) requires the furnisher to seek out and obtain such evidence before reporting the information as 'verified'."). It is undisputed that Mariner simply failed to do so, for *any* of the Plaintiff's multiple disputes - which is particularly glaring here, where the identity thief has sworn under oath that she fraudulently

---

[3] Whether that other customer would necessarily admit to committing a crime is somewhat beside the point (a point we can never get to if the question isn't ever asked). The point is that a reasonable investigation at least requires *asking that question.* And here, Deanna Taylor has admitted under oath to committing this fraud (*see,* Exhibit D), so it isn't like she is denying what she did.

opened this account. That simply does not meet the 'reasonable person' standard, which means that Mariner's investigations simply were not sufficient under the FCRA.

In any event, "whether an investigation is 'reasonable' under the FCRA is a question of fact for the jury." *Johnson v. Freedom Mortg. Corp.*, No. 21-cv-2760 (KMM/ECW), 2024 U.S. Dist. LEXIS 136151, at *11 (D. Minn. Aug. 1, 2024), quoting *Edeh v. Midland Credit Mgmt., Inc.*, 748 F. Supp. 2d 1030, 1039 (D. Minn. 2010). This case is no different, where a reasonable jury could look at these facts and conclude that Mariner's investigations did not rise to the level of the 'searching inquiry' required by the law. *See e.g., Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991) (observing that a claim for failure to investigate "is properly raised when a particular credit report contains a factual deficiency or error that could have been remedied by uncovering additional facts"). Thus, even if Mariner had submitted admissible evidence demonstrating what their investigations entailed – and here they did not – summary judgment would still not be warranted here.

As we pointed out in our original opposition to summary judgment, the other information we obtained in discovery also raises serious questions about the credibility of Mariner's witnesses that only a jury can resolve. The only information Mariner's 30(b)(6) witness *was* able to provide about Defendant's dispute investigation practices casts serious doubt on the credibility of Ms. Myers Declaration regarding those investigations conducted years ago (if any credibility is left after her deposition). Mr. Nau testified that Mariner receives anywhere between **6,000-12,000 credit reporting disputes each month.** *See,* Exhibit A, 49:15 – 50:7. Mariner has a total 4 investigators assigned to handle all of those

disputes. *See id.,* 51:5-21. Those investigators work regular 40-hour workweeks. *See id.,* 52:13 – 53:6. Mr. Nau testified that the Mariner investigators would each typically investigate 20 credit reporting disputes *each hour.* *See id.,* 54:21-55:13. Mariner does not require its investigators to document the steps they took during their investigations. *See id.,* 59:14-17. As a result - other than a brief notation such as the control number and response code - Mariner's business records contain zero notations as to what its investigators did during the course of the investigations into Ms. Taylor's disputes in 2021, 2023 and 2024. *See id.,* 29:3-11; 47:5-21.

Ms. Myers would have done these dispute investigations 1.5-2.5 years before her November 2025 Declaration, which means she has necessarily handled – ***at least*** – **27,000** dispute investigations since the last time she has investigated a dispute from Ms. Taylor[4]. At the upper range, she could have handled up to **90,000** dispute investigations since the 2023 disputes.[5] And yet, Ms. Myers suddenly purported to remember with perfect recall – in November 2025 - the exact steps she took to investigate each of these specific disputes years ago, with zero business records to guide her as to her actions on those dates. This is facially implausible and, quite literally, impossible. As her deposition testimony taken in February 2026 makes clear, it is also completely made-up. At minimum, this evidence raises a triable issue of fact. A jury should get to hear this testimony from Ms. Myers and

[4] 18 months since the last dispute investigation in mid-2024, calculated at 1,500 dispute investigations each month (if Mariner only received 6,000 disputes in each of those months, the lowest end of their range, since Ms. Myers is one of the 4 Mariner investigators).

[5] 30 months since the mid-2023 disputes, calculated at 3,000 dispute investigations each month ((if Mariner received 12,000 disputes in each of those months, the highest end of their range, since Ms. Myers is one of the 4 Mariner investigators).

weigh her credibility at trial to see if they really believe she has this sort of incredible memory – which she herself repeatedly denied having, a mere 2.5 months after signing that Declaration.

**B. Plaintiff Suffered Actual Damages Because Of The Defendant's Persistent Refusal To Remove The Fraudulent Account From Her Credit Reports.**

As set forth extensively in the accompanying Declaration of Melissa Taylor, the Plaintiff has suffered extreme emotional distress as a result of Defendant's action, which manifested itself in physical symptoms including vomiting, inability to sleep, inability to eat and the need for 2 separate prescription anti-depressant medications. *See,* Declaration of Melissa Taylor. The Eighth Circuit has repeatedly held that, "for FCRA claims, 'mental pain and anxiety can constitute actual damages'." *Peterson v. Equifax Info. Servs.*, 44 F.4th 1124, 1127 (8th Cir. 2022), quoting *Taylor v. Tenant Tracker, Inc.*, 710 F.3d 824, 828 (8th Cir. 2013); see also, *Millstone v. O'Hanlon Reps., Inc.*, 528 F.2d 829, 834-35 (8th Cir. 1976). Moreover, a plaintiff may establish emotional distress damages through her own testimony. *Peterson,* 44 F.4th at 1127; *Taylor v.*, 710 F.3d at 828.

In their Motion, Defendant makes much ado about the fact that this fraudulent account was reporting positively, so that they were somehow *helping* Ms. Taylor by continuing to report that this fraudulent account belonged to her. However, it bears noting that emotional distress damages are recoverable even if there isn't an accompanying monetary harm, such as a denial of credit: "Relief under the FCRA may also include damages for emotional distress, even when no out-of-pocket damages have been sustained." *Zean v. Unifund CCR Ptnrs. & Experian Info. Sols., Inc.*, 2009 U.S. Dist.

LEXIS 69707, at *8-9 (D. Minn. Aug. 10, 2009); *Edeh v. Equifax Info. Servs., LLC*, 974 F. Supp. 2d 1220, 1242 (D. Minn. 2013)("A consumer who is ultimately able to obtain credit may still be able to obtain emotional distress damages, and time spent trying to resolve a problem with a CRA may also be taken into account in assessing emotional damages"); *Millstone v. O'Hanlon Reports, Inc.*, 528 F.2d 829, 834 (8th Cir. 1976) (holding that rule providing no recovery for 'mere mental pain and anxiety' is inapplicable in FCRA actions); *Bakker v. McKinnon*, 152 F.3d 1007, 1013 (8th Cir. 1998) (holding plaintiffs could recover for emotional distress suffered when their credit reports were unlawfully obtained and their privacy violated based upon testimony regarding how they felt as a result of these acts).

In this action, the Plaintiff extensively details the considerable impact that Mariner's continued reporting of this fraudulent account had on her life. She attests to the multiple attempts over 3 years that she made to get this 'positive' account off her credit report, and the unshakeable feelings of helplessness and hopelessness as all of her efforts ran into a brick wall. *See,* Plaintiff's Declaration, ¶8-13. She attests to how fighting with Mariner to correct her credit report *for years* took an inevitable toll on her, leading her to start taking antidepressants such as Bupropion and Venlafaxine. *Id.,* ¶13-14. She just felt this cloud following her wherever she went, knowing that this account was stuck on her credit report and not seeing any path forward to get that corrected. *Id.,* ¶15-17. The depression that took ahold of her as a result of Mariner's actions caused her to withdraw from social interaction and prevented her from rebuilding the social network she needed to get through this tough time in her life, after she had moved from New York to Minnesota to physically

put distance between herself and her mother. *Id.,* ¶17-18. She further experienced embarrassment and humiliation when having to explain why this account was not hers, when going through her credit with landlords who were evaluating her credit history for apartment rentals or mortgages. *Id.,* ¶22.

From a physical standpoint, the Plaintiff would spend night after night, just lying in bed, unable to sleep because of the crippling anxiety she was experiencing, and many days would not be able to bring herself to get up and go to work or to the store. *Id.,* ¶19-20. She vomited on multiple occasions because of this ongoing stress and anxiety, and many days was unable to eat because of this. *Id.,* ¶21.

Between the detailed description of her emotional distress, the medication taken to treat it, and the physical symptoms that she has described, the Plaintiff has plainly adequately described her emotional distress in non-conclusory terms. In *Millstone*, the Eighth Circuit affirmed an award of emotional distress damages under the FCRA where the plaintiff suffered "loss of sleep, nervousness, frustration and mental anguish" as a result of a "grossly inaccurate" consumer report. *Millstone*, 528 F.2d at 834. *See also, Vandervort v. Nationstar Mortg., LLC*, 2015 U.S. Dist. LEXIS 183367, at *27-28 (W.D. Mo. Feb. 11, 2015)(in FCRA case, finding that "Mr. Vandervort has alleged sufficient facts here to support his claim for emotional distress damages. He claims that he has suffered from 'a) extreme anxieties, b) insomnia & waking up in the middle of the night in a panic, c) extreme depression, d) inability to concentrate, e) easily irritable, f) mood swings, g) fear and paranoia, h) extreme fluctuations in diet, i) emotional outbursts, j) mental & physical exhaustion, and k) increased alcohol consumption"); *Cortez v. Trans Union, LLC*,

617 F.3d 688, 719 (3d Cir. 2010) (sufficient evidence of genuine injury where plaintiff suffered "severe anxiety, fear, distress, and embarrassment," as well as sleeplessness that required medication, and a relative testified that the plaintiff "cried often and lost weight due to the stress regarding her credit report over the two-year ordeal").

Unlike the cases that Defendant cites, this was not a short ordeal which was promptly rectified. *See e.g., Taylor v. Tenant Tracker, Inc.,* 710 F.3d 824, 829 (8th Cir. 2013) (even though the FCRA plaintiff cried during a meeting, "a brief episode of frustration and unhappiness does not establish the sort of concrete emotional distress that is required to constitute a genuine injury and actual damages"). To the contrary, the Plaintiff disputed this account *six separate times, over the course of 3 years*, and <u>still</u> got nowhere. *See e.g., Graham v. CSC Credit Servs.,* 306 F. Supp. 2d 873, 880 (D. Minn. 2004)(noting that "Graham suffered the humiliation of having creditors view his incorrect credit report" and that "Graham's testimony regarding his frustration, anxiety, and humiliation throughout his ordeal raised a genuine issue of material fact regarding whether he suffered emotional distress damages").

To the extent that Defendant argues that its reporting couldn't have harmed the Plaintiff because the account was positive, that argument is nonsensical. Defendant relies on a handful of cases where the account *actually belonged to the consumer*, but was reporting in an inaccurate manner which nevertheless benefitted them. *See e.g., Bueno v. Experian Info. Sols., Inc.*, 664 F. Supp. 3d 800, 802 (N.D. Ill. 2023)(noting that omitting a bankruptcy flag from the debtor's account was a "wind in her sails, not an anchor" and that "not all mistakes are injuries"); *Stagger v. Experian Info. Sols.*, 2022 U.S. Dist. LEXIS

39267, at *1-2 (N.D. Ill. Feb. 9, 2022)(where Experian similarly reported the debtor's account as positive, rather than discharged in bankruptcy, which would be a derogatory mark). Reporting someone's account positively, when it should be negative, is a very different thing *than continuing to associate someone with a fraudulent account which does not belong to them and which they don't want to be associated with.*

## CONCLUSION

Defendant moved for summary judgment on the reasonableness of its dispute investigations, heavily premised on an extensive 9-page Declaration detailing all of the steps followed during those investigations. However, that same Declarant then testified at her deposition, a mere 2 months later, that she does not know whether or not her statements in the Declaration are actually true. Defendant cannot possibly have demonstrated that – as a matter of law – these dispute investigations were reasonable and that no reasonable jury could disagree, because it has offered zero admissible evidence as to what its dispute investigations actually consisted of. Simply put, movants cannot get summary judgment just because they find a naïve employee willing to sign her name to statements in a sworn Declaration that may or may not be true. If that employee lacks the personal knowledge to attest to those statements – as we have demonstrated is the case with Ms. Myers here – then that Declaration simply cannot be considered under FRCP 56(c)(4). Instead, it is respectfully submitted that sanctions under FRCP 56(h) is appropriately awarded here.

Defendant's Motion for Summary Judgment should also be denied, where Ms. Taylor extensively detailed – in nonconclusory terms - the emotional distress she suffered at Defendant's hands over the course of several years.

Dated: March 5, 2026

Respectfully submitted,

By:__/s/ Yitzchak Zelman______________
Yitzchak Zelman, Esq.
*Lead counsel for the Plaintiff, Melissa Taylor*

## LOCAL RULE 7.1(f)(2) CERTIFICATION

I, Yitzchak Zelman, certify that Plaintiff's Opposition to Defendant's Motion for Summary Judgment the complies with Local Rule 7.1.

I further certify that, in preparation the Memorandum, I used Microsoft Word, and that this word processing program has been applied specifically to include all text, including headings, footnotes, and quotations in the following word count. I further certify that the Memorandum contains 11,345 total words.

By: /s/ Yitzchak Zelman
Yitzchak Zelman, Esq.
Marcus Zelman, LLC
*Attorney for the Plaintiff*

**CERTIFICATE OF SERVICE**

This is to certify that on March 6, 2026, I have caused a copy of the foregoing to be electronically filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

By:__/s/ Yitzchak Zelman_______________
Yitzchak Zelman, Esq.
Marcus Zelman, LLC
*Attorney for the Plaintiff*