**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

MELISSA TAYLOR,

                                              Civil No. 25-60 (JRT/JFD)

                    Plaintiff,

v.

MARINER FINANCE, LLC; JP MORGAN          **MEMORANDUM OPINION AND ORDER**
CHASE BANK, N.A.; DISCOVER FINANCIAL     **DENYING DEFENDANT MARINER**
SERVICES, LLC; EQUIFAX INFORMATION       **FINANCE, LLC'S MOTION FOR SUMMARY**
SERVICES, LLC; EXPERIAN INFORMATION      **JUDGMENT**
SOLUTIONS, INC.; and TRANS UNION, LLC,

                    Defendants.

---

Ryan D. Peterson, **CONSUMER JUSTICE LAW FIRM PLC**, 6600 France Avenue, Suite 602, Edina, MN 55435; Yitzchak Zelman, **MARCUS & ZELMAN, LLC**, 701 Cookman Avenue, Asbury Park, NJ 07712, for Plaintiff.

Natalia S. Kruse, **HUSCH BLACKWELL LLP**, 80 South Eighth Street, Suite 2800, Minneapolis, MN 55402; Nicholas S. Agnello, **HUSCH BLACKWELL LLP**, 1801 Pennsylvania Avenue Northwest, Suite 1000, Washington, DC 20006, for Defendant Mariner Finance, LLC.

Plaintiff Melissa Taylor initiated this action against various financial institutions and credit reporting agencies, alleging violations of the Fair Credit Reporting Act ("FCRA") after they refused to remove certain accounts from her credit reports following her allegations that such accounts were the product of identity theft. All defendants, except Mariner Finance, LLC ("Mariner"), have settled. Taylor alleges that Mariner negligently or willfully violated § 1681s-2(b) of the FCRA by failing to reasonably investigate her disputes

and correct her account information.    Taylor seeks to recover actual, statutory, and punitive damages, as well as attorney's fees and costs.    Mariner now moves for summary judgment on Taylor's claim against it under the FCRA.    Because there are genuine disputes of material fact as to whether Mariner reasonably investigated Taylor's credit disputes and whether Taylor suffered actual damages because of Mariner's alleged FCRA violations, the Court will deny Mariner's motion for summary judgment.

In addition, the Court will deny Taylor's request for sanctions stemming from Mariner's submission of the Myers Declaration because Taylor has failed to produce evidence sufficient to show bad faith.

## BACKGROUND

### I.    FACTUAL BACKGROUND

Mariner provides "loan-by-mail" services.    (Decl. of Yitzchak Zelman ("Zelman Decl.") ¶ 2, Ex. A ("Nau Dep.")[1] 10:17–11:12, Mar. 6, 2026, Docket No. 125.)    "Loan-by-mail" refers to a loan in which the consumer receives a loan offer in the mail in the form of a check that is accompanied by loan disclosures, and the borrower can accept the loan's terms by cashing or depositing the check.    (*Id*.)

---

[1] Brent Nau is the senior vice president of compliance at Mariner and served as Mariner's witness under Federal Rule of Civil Procedure 30(b)(6).  (*See* Nau Dep. at 4:1-2; 5:19–20.)

A.      2017 Loan

On December 6, 2017, Taylor obtained a loan from Mariner in the amount of $2,539.  (Decl. of Natalia S. Kruse ("Kruse Decl.") ¶ 15, Ex. 11 at 35, Nov. 20, 2025, Docket No. 74.)  As part of that loan, Taylor identified her street address in Auburn, New York. (Nau Dep. 12:1–5.)  The check was endorsed by Melissa Taylor—or someone purporting to be Melissa Taylor—and displayed a phone number ending in 5701.  (*Id.* at 12:20–23.) Taylor made monthly loan payments from 2017 through 2020.  (Kruse Decl. ¶ 15, Ex. 11 at 35.)  The 2017 loan was repaid in full on June 15, 2020.  (*See* Kruse Decl. ¶ 5, Ex. 1 ¶ 16 ("Myers Decl."[2]); *see also* Pl.'s Am. Opp'n Mem. at 5, Mar. 6, 2025, Docket No. 124.)

Over the course of the loan, Mariner spoke with Taylor by telephone on multiple occasions.  (Myers Decl. ¶ 15; *see also* Pl.'s Am. Opp'n Mem. at 5.)  Taylor's subsequent credit reports reflect the 2017 Loan as paid and carrying a zero balance.  (Kruse Decl. ¶ 6, Ex. 2 (2023 Equifax Report); ¶ 7, Ex. 3 (2023 Experian Report); ¶ 8, Ex. 4 (2023 Trans Union Report).).  Taylor admits that she obtained the 2017 loan.  (Zelman Decl. ¶ 6, Ex. E ("Taylor Dep.") 103:19–106:7.)

---

[2] Mariner submitted a declaration from Jamie Myers in support of its motion for summary judgment. (*See* Kruse Decl. ¶ 5, Ex.1.)  Mariner, however, withdrew Myers's declaration following Myers' deposition. (Def.'s Reply Mem. at 1 n.1, Mar. 27, 2026, Docket No. 131.)  Despite the withdrawal of Myers' declaration, Taylor admits to several facts contained in Myers' declaration. Accordingly, the Court will disregard the contents of Myers's declaration except for those matters to which Taylor has admitted or does not otherwise dispute. *See Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 992–93 (8th Cir. 2011) (noting that a party's admissions may be considered when ruling on a summary judgment motion); *see also* Fed. R. Civ. P. 56(c)(1)(A).

B.      2020 Loan

In December 2020, Taylor—or someone purporting to be Taylor—obtained a loan from Mariner in the amount of $2,539. (Kruse Decl. ¶ 15, Ex. 11 at 27.) Like the 2017 loan, Mariner delivered the funds by check to the same street address in Auburn, New York. (Zelman Decl. ¶ 7, Ex. F.) The check was endorsed by Taylor, or by an someone purporting to be Taylor, and listed a telephone number ending in 5701. (*Id.*) The funds were deposited into a checking account belonging to a travel agency named "Finger Lakes Travel." (Nau Dep. 14:1–17.) The 2020 loan was paid off on April 3, 2024. (Nau Dep. 17: 2–4.) Mariner never reported any delinquencies with respect to the 2020 loan. (*See* Kruse Decl. ¶ 15, Ex. 11 (2024 Equifax Report); ¶ 16, Ex. 12 (2024 Experian Report); ¶ 17, Ex. 13 (2024 Trans Union Report).) During her deposition, Taylor testified that she did not take out the 2020 loan; rather, her mother, DeAnna Taylor, obtained the loan using Taylor's name. (Taylor Dep. 104:17–105:5.) DeAnna Taylor admitted that the 2020 Loan was obtained in Taylor's name without Taylor's knowledge or consent and that the loan proceeds were used to finance DeAnna Taylor's travel agency business. (Zelman Decl. ¶ 5, Ex. D.)

During Taylor's deposition, she testified that in 2019, she learned that her mother was taking out loans in her name without her knowledge or consent. (Taylor Dep. 68:21–69:12.) Taylor did not discover the 2020 loan until she reviewed her credit report in 2021. (Taylor Dep. 101:21–22, 107:17–108:13.) In November 2021, Taylor filed a generalized fraud dispute through credit reporting agencies (CRAs), specifically, Equifax Information

Services, LLC ("Equifax"), Experian Information Solutions, Inc. ("Experian"), and Trans Union, LLC ("Trans Union").[3]  (*See* Taylor Dep. 70:17–71:4.)

### C.      April 2023 Credit Disputes

On April 14, 2023, Taylor filed a Federal Trade Commission (FTC) Identity Theft Report, alleging that the 2020 Loan, a Discover account, and a JPMorgan account had been fraudulently opened using Taylor's identity.  (Kruse Decl. ¶ 11, Ex. 7.)  Taylor named her mother, DeAnna Taylor, as the "suspect" and stated that her "mother owned a travel agency that was struggling and she was desperate to keep it afloat so she got credit any way she could, did it all behind [Taylor's] back, deceived [Taylor's] whole family, and now it's severely impacting [Taylor's] credit score."  (*Id.* at 3.)

That same day, Taylor filed a police report with the Seneca Falls Police Department, reporting that her mother had opened several accounts and credit cards in her name without her consent.  (Kruse Decl. ¶ 12, Ex. 8.)  On May 15, 2023, the Seneca Falls Police Department disposed of the report, marking the report as "CLOSED – Pros. Declined."  (*Id.* at 1.)  At her deposition, Taylor testified that although she did not submit the FTC identity theft report and police report until April 2023, she first discovered the identity theft in 2021.  (Taylor Dep. 65:12–66:19; 100:4–13.)

---

[3] Taylor does not allege any FCRA claims related to the 2021 dispute because it is beyond the 2-year statute of limitations.  (Pl.'s Am. Opp'n Mem. at 12.)

On April 18, 2023, Taylor mailed letters, each dated April 12, 2023, to Equifax and Trans Union in which she disputed the 2020 loan and the Discover and JP Morgan credit card accounts on the basis of identity theft.  (*See* Kruse Decl. ¶ 5, Exs. 1-F (April 18, 2023 Equifax Dispute), 1-G (April 18, 2023 Trans Union Dispute); *see also* Pl.'s Am. Opp'n Mem. at 13 (admitting Taylor sent the letters).)  As a result of Taylor's dispute, Mariner received Automated Credit Dispute Verification ("ACDV") forms from Equifax and Trans Union. (Kruse Decl. ¶ 5, Ex. 1-E; Pl.'s Am. Opp'n Mem. at 13 (admitting Mariner received ACDV forms from Equifax and Trans Union in April 2023); *see also* Nau Dep. 64:10–12.)

Defendants asserted that Mariner's credit compliance manager, Jamie Myers investigated and responded to the April 2023 ACDV, but Mariner's corporate representative and Myers herself testified that they lacked knowledge about what Myers did during these alleged investigations.  (Nau Dep. 36:23–38:13, 47:5–48:25, 57:14–21; Zelman Decl. ¶ 9, Ex. H ("Myers Dep.") 34:10–35:3, 36:21–37:13.)

- Myers could not testify with certainty that she "reviewed Mariner's records for the 2020 Loan, including the payment history and servicing history."  (Myers Dep. 73:8–74:10.)

- Myers could not attest that she "examined Mariner's broader file about its business relationships with [Taylor] and that she [Myers] learned that [Taylor] had a previous loan with Mariner in 2017, which was also timely and fully repaid, and that Mariner had no record of receiving any credit disputes regarding the 2017 loan[.]"  (*Id.* at 74:11–22.)

- Myers also could not testify whether her investigation of the April 2023 dispute "revealed that the 2017 loan and the 2020 loan were consummated by mail at the same address and the borrower provided the same home phone number for both loans[.]"  (*Id.* at 74:24–75:5.)

- Myers could not confirm that Mariner spoke with Taylor "on numerous occasions" throughout the life of the 2017 and 2020 loans.  (*Id.* at 75:6–16.)

- Myers could not confirm her prior statement that "Mariner was not informed of any potential identity theft until years after the 2020 Loan was opened and after years of timely payments, which from [Myers's] perspective, would not be typical for an account involving identity theft."  (*Id.* at 75:17–76:7.)

- Myers could not confirm her prior statement that read: "I recognize that [Taylor] identified a different telephone number and address in connection with [the] April 2023 Dispute.  However, I did not believe that this explained the active repayment history or similarities between the 2020 Loan and the 2017 Loan."  (*Id.* at 76:9–23.)

- Myers could not confirm whether "[Taylor] was responsible for the 2020 loan" nor could she confirm that any potential conclusion "was based in part on the active and current repayment (sic) history for the 2020 Loan, [Taylor]'s 2017 Loan, [Taylor]'s prior association with the address and phone number used for the 2020 Loan, and calls with the borrower during which there was no suggestion of identity theft."  (*Id.* at 76:25–77:18.)

- Myers could also not confirm her prior testimony in which she claimed that she "escalated [Taylor]'s dispute to [her] supervisor, Kellye Mull" and that "Mull found no reason to change the result of [Myers's] investigation."  (*Id.* at 77:20–78:7.)

At no point did Mariner contact DeAnna Taylor to ask if she, rather than Taylor, had opened the accounts.  (Nau Dep. 89:12–20.)  Mariner ultimately reported the results of its investigation to the CRAs, stating that the information it had furnished regarding the 2020 Loan was accurate, although disputed by Taylor.  (Myers Decl ¶ 49; *see also* Pl.'s Am. Opp'n Mem. at 22 ("[Taylor] does not dispute" the facts set forth in Paragraph 49 of the Myers Declaration).)

### D.    Fall 2023 Credit Disputes

On September 20, 2023, Taylor filed another FTC identity theft report, reiterating her assertions that the 2020 Loan and the Discover and JP Morgan accounts had been fraudulently opened using Taylor's identity.  (Zelman Decl. ¶ 8, Ex. G (September 2023 FTC Identity Theft Report).)  On September 29 and October 8, 2023, Taylor mailed letters to Equifax disputing those same accounts, including the 2020 Loan, on the basis of identity theft.  (Myers Decl. ¶¶ 51–52; *see also* Pl.'s Am. Opp'n Mem. at 23 (admitting to the contents of Paragraphs 51 and 52 of the Myers Declaration).)  In response to Taylor's disputes, Equifax sent Mariner two ACDV forms in October 2023.  (Myers Decl. ¶¶ 52–53; Pl.'s Am. Opp'n Mem. at 23 (admitting Mariner received two ACDV forms from Equifax in October 2023).)

In her Declaration, Myers testified that in response to the September 29 and October 8, 2023 disputes, she "examined the disputes and the information provided by [Taylor] and determined that it was duplicative of or cumulative to information previously reviewed" and therefore "found no reason to doubt the validity of the conclusions reached during [her] prior investigation."  (Myers Decl. ¶ 53.)  But at her deposition, Myers could not confirm whether that testimony was true.  (Myers Dep. 78:24–79:11.)

Like the April 2023 dispute, Mariner subsequently reported to the CRAs that the information Mariner had provided regarding the 2020 Loan was accurate but disputed by Taylor.  (Myers Decl. ¶ 54; *see also* Pl.'s Am. Opp'n Mem. at 24 (indicating that Taylor "does not dispute" the facts set forth in Paragraph 54 of the Myers Declaration).)

### E.    April 2024 Credit Disputes

On April 11 and April 16, 2024, Taylor mailed letters to Equifax and Trans Union, respectively, once again asserting that the 2020 Loan and the Discover and JP Morgan accounts had been fraudulently opened using Taylor's identity.  (Myers Decl ¶¶ 55–56; *see also* Pl.'s Am. Opp'n Mem. at 24 (admitting the contents of Paragraph 55 and 56 of the Myers Declaration).)   In response to the disputes, Equifax and Trans Union sent Mariner ACDV forms in April 2024.  (Myers Decl. ¶¶ 55–57; Pl.'s Am. Opp'n Mem. at 24 (admitting Mariner received ACDV forms from Equifax and Trans Union in April 2024).)

In her Declaration, Myers testified that in response to the April 2024 disputes, she "examined [Taylor]'s disputes and the information provided by [Taylor] and determined that it was duplicative or cumulative to information previously reviewed" and thus "found no reason to doubt the validity of the conclusions reached during [her] prior investigation."  (Myers Decl. ¶ 57.)  But when asked about her investigation of the April 2024 disputes, she could not confirm whether her prior testimony was true.  (Myers Dep. 79:16–80:3.)

Like the April 2023 and Fall 2023 disputes, Mariner reported to the CRAs that the information Mariner had provided regarding the 2020 Loan was accurate but disputed by Taylor.  (Myers Decl. ¶ 58; *see also* Pl.'s Am. Opp'n Mem. at 25 (admitting the contents of Paragraph 58 of the Myers Declaration).)

### F.    Alleged Damages

Taylor alleges that Mariner failed to conduct a reasonable investigation of the April 2023, Fall 2023, and April 2024 credit disputes in violation of 15 U.S.C. § 1681s-2(b). (Compl. ¶¶ 104–113, Jan. 7, 2025, Docket No. 1.)  She seeks actual damages, among other forms of relief.  (*Id.* at 18.)

According to Taylor's responses to Mariner's interrogatories, she "was repeatedly denied credit opportunities, including [being quoted] higher rates or [receiving] denials from lenders," such as Better Mortgage Corporation, Bank of America, Wells Fargo, Capital One, and SoFi Mortgage Corporation.  (Zelman Decl. ¶ 4, Ex. C at 9.)  At her deposition, however, Taylor testified that she never received any notifications indicating that the Mariner account was negatively affecting her credit.  (Taylor Dep. 109:24–110:2.)  Taylor also testified that she did not believe that the Mariner account was negatively affecting her credit because it was not one of the delinquent accounts.  (*Id.* at 110:3–6.)

Taylor also claims that she "suffered great distress, anger, annoyance and frustration in her daily life."  (Zelman Decl. ¶ 4, Ex. C at 10.)  She claims that Mariner's actions caused her "immense" physical and mental suffering.  (Decl. of Melissa Taylor ("Taylor Decl.") ¶ 4, Dec. 11, 2025, Docket No. 89.)  She states after her mother stole her identity and "saddled [her] credit reports with all of these accounts that were not [hers]," she began "suffering intense depression, anxiety and emotional distress."  (*Id.* ¶ 5.)  Taylor then sought medical treatment and was prescribed antidepressants such as Bupropion and Venlafaxine.  (*Id.* ¶¶ 6, 14.)  Although some of Taylor's stress stemmed from her

-10-

mother's actions, Taylor's repeated unsuccessful efforts to clear her credit history also contributed to that stress.  (*Id.* ¶ 7.)  She states that at times, she felt "helpless[] and hopeless[]" (*id.* ¶ 13), "weighed down by the constant burden" (*id.* ¶ 15), and "embarrass[ed]" (*id.* ¶ 22) because of Mariner's refusal to correct her credit reports.  Taylor claims that she struggled to sleep and vomited because of the stress.  (*Id.* ¶¶ 19–21.)

Taylor also discussed her difficulties at her deposition.  In May 2024, Taylor attended approximately five sessions with a psychologist through her employee assistance program.  (Taylor Dep. 93:8–23.)  She testified that she sought assistance because she was "having a really difficult time" due to "the situation of not being in contact with [her] mother and moving away from New York [to Minnesota] to kind of rebuild [her] life."  (*Id.* at 94:17–95:9.)  She also testified that she had not spoken to any medical providers or mental health providers about Mariner.  (*Id.* at 111:14–19.)  Taylor also noted that her mother "traumatized" her because her mother stole her identity to protect her own business.  (*Id.* at 40:3–19.)

## II.    PROCEDURAL BACKGROUND

On January 7, 2025, Taylor commenced this twelve-count action against Mariner, JP Morgan Chase Bank, N.A., Discover Financial Services, LLC, Equifax, Experian, and Trans Union under the FCRA, 15 U.S.C. § 1681 *et seq.*  (Compl. ¶¶ 4–5.)  Taylor generally alleges that Defendants violated the FCRA by failing to remove certain accounts from her credit reports that she contends were the result of identity theft.  (*Id.*)  She seeks statutory,

actual, and punitive damages, as well as injunctive and declaratory relief and attorneys' fees and costs.  (*Id.* ¶ 8.)

Taylor has resolved all claims, except her claim against Mariner.[4]  In that remaining claim—Count XI—Taylor alleges that Mariner negligently or willfully failed to conduct a proper investigation under 15 U.S.C. § 1681s-2(b) in response to Taylor's disputes, as submitted to the CRAs in April 2023, Fall 2023, and April 2024.  (Compl. ¶¶ 104–13.)

Mariner now moves for summary judgment on Taylor's claim against it.  (Mot. for Summ. J., Nov. 20, 2025, Docket No. 72.)

**DISCUSSION**

## I.   STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the lawsuit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio*

---

[4] (*See* Docket Nos. 51, 59, 61 (Experian); 55, 62, 63 (Equifax); 60, 61 (Trans Union); 66, 77, 92 (JP Morgan); 70, 78, 92 (Discover).)

*Corp.*, 475 U.S. 574, 587 (1986).  The nonmoving party may not rest on mere allegations or denials but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial.  *Anderson*, 477 U.S. at 256 (discussing Fed. R. Civ. P. 56(e)).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.* at 252.

## II.    ANALYSIS

Mariner moves for summary judgment on Taylor's sole remaining claim which alleges that Mariner failed to properly investigate credit disputes in violation of 15 U.S.C. § 1681s-2(b).

Congress enacted the FCRA "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy."  *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007).  The FCRA applies not only to CRAs but also to those who "furnish" data to CRAs—such as Mariner.  *See* 15 U.S.C. § 1681s-2(b).  Under the FCRA, when a furnisher of credit information, such as Mariner, receives notice from a CRA that a consumer disputes the completeness or accuracy of information furnished to a CRA, the furnisher must:

> (A) conduct an investigation with respect to the disputed information;
>
> (B) review all relevant information provided by the consumer reporting agency . . . ;

(C) report the results of the investigation to the consumer reporting agency;

(D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the [furnisher] furnished the information and that compile and maintain files on consumers on a nationwide basis; and

(E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation . . . , for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly—

(i) modify that item of information;

(ii) delete that item of information; or

(iii) permanently block the reporting of that item of information.

15 U.S.C. § 1681s-2(b)(1).  In other words, if a furnisher receives notice of a consumer's indirect dispute from a CRA, the furnisher must investigate the dispute and then report the results to the CRA that provided notice of the dispute.  It must also report the results to the other CRAs if the investigation finds the disputed information was incomplete or inaccurate.  The "investigation 'requires some degree of careful inquiry'" by furnishers. *Schaffhausen v. Bank of Am., N.A.*, 393 F. Supp. 2d 853, 858 (D. Minn. 2005) (quoting *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 430 (4th Cir. 2004)).

If a furnisher fails to satisfy these requirements, the consumer has a cause of action against the furnisher.  If the furnisher is "negligent in failing to comply with" the requirements of the FCRA, the consumer may recover "any actual damages sustained . . .

-14-

as a result of the failure" as well as "the costs of the action together with reasonable attorney's fees as determined by the court."  15 U.S.C. § 1681o(a).  Alternatively, if the furnisher "willfully fails to comply" with the requirements of the FCRA, the consumer may recover not only actual damages and costs and attorney's fees, but also statutory and punitive damages.  15 U.S.C. § 1681n(a).

Mariner argues that summary judgment is appropriate for three reasons.  **First**, Mariner's investigation of Taylor's credit disputes was reasonable as a matter of law.  **Second**, Taylor has failed to show that Mariner willfully violated the FCRA.  **Third**, Taylor has failed to show that she suffered actual damages that were caused by Mariner.  The Court will address Mariner's first two arguments together and then proceed to Mariner's third argument.

### A.    Reasonable Investigation and Willfulness

Taylor alleges that Mariner violated 15 U.S.C. § 1681s-2(b) by failing to reasonably investigate Taylor's credit disputes.  Taylor further asserts that Mariner is liable for statutory and punitive damages because it acted willfully under 15 U.S.C. § 1681n. Because the record does not clearly establish what Mariner's investigation actually entailed, genuine issues of material fact remain as to whether the investigation was reasonable and whether Mariner willfully violated § 1681s-2(b) by failing to conduct a reasonable investigation.  The Court will therefore deny Mariner's motion for summary judgment on these issues.

When a furnisher of credit information, such as Mariner, receives notice from a CRA that a consumer has disputed the accuracy of credit information reported by the furnisher, the furnisher has a duty under the FCRA to investigate the dispute, to report the results of the investigation to the CRA, and, if the furnisher concludes that the disputed debt is inaccurate, incomplete, or unverifiable, to take certain corrective actions. 15 U.S.C. § 1681s-2(b)(1).  The furnisher's investigation must be reasonable. *Schaffhausen*, 393 F. Supp. 2d at 858.  Whether an investigation is reasonable is generally a question of fact for the jury.  *Edeh v. Midland Credit Mgmt., Inc.*, 748 F. Supp. 2d 1030, 1039 (D. Minn. 2010), *aff'd*, 413 F. App'x 925 (8th Cir. 2011).

Willfulness is not an element of an FCRA claim, but Taylor may be entitled to statutory or punitive damages if Mariner's violation was willful.  15 U.S.C. § 1681n(a). That is, Taylor may recover statutory and punitive damages even if she did not suffer actual damages, so long as the violation was willful.  *Bakker v. McKinnon*, 152 F.3d 1007, 1013 (8th Cir. 1998) ("Actual damages are not a statutory prerequisite to an award of punitive damages under the [FCRA]."  (quotation omitted) (alteration in original)).  To establish willful noncompliance with the FCRA's requirements, Taylor must demonstrate that Mariner "knowingly and intentionally committed an act in conscious disregard for the rights of others," though she "need not show malice or evil motive."  *Id.* (quoting *Cushman v. Trans Union Corp.*, 115 F.3d 220, 226 (3d Cir. 1997)).  Willfulness may be proved by showing that the furnisher of credit information "knowingly, intentionally, or

recklessly committed an act in conscious disregard of [the plaintiff's] rights." *Lloyd v. FedLoan Servicing*, 105 F. 4th 1020, 1026 (8th Cir. 2024).[5]

Here, Mariner relies on the Myers Declaration, which was signed in November 2025, to support its contention that its investigation of Taylor's disputes was reasonable. The difficulty, however, is that Mariner subsequently withdrew that declaration after Myers was unable to confirm, during her February 2026 deposition, whether the statements contained in the declaration were true.

As a result, the Court cannot rely on large parts of the Myers Declaration, which would otherwise have provided some detail regarding the investigation. Nor can the Court rely on the testimony of Mariner's corporate representative, Brent Nau, who was unable to testify about what actually occurred during the alleged investigations into Taylor's disputes—as he instead described only the company's typical procedures for investigating disputes. (*See* Nau Dep. 35:6–38:13, 47:5–48:25, 57:14–21.)

Because the Court cannot determine what Myers—or any other Mariner employee, for that matter—did to investigate Taylor's disputes, it cannot conclude as a matter of law that Mariner's investigation was reasonable. *See Owoyemi v. Credit Corp. Sols. Inc.*, 677 F. Supp. 3d 285, 299 (S.D.N.Y. 2023) (denying summary judgment to a defendant on a § 1681s-2(b) claim where the defendant failed to provide details about its

---

[5] Reckless conduct involves "an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Safeco*, 551 U.S. at 68 (citation omitted).

-17-

investigation and noting that "an investigation will not be deemed sufficient without at least some evidence of what the investigation actually entailed").[6]  Moreover, because the Court is unable to ascertain the actual steps Mariner took as part of its investigation into Taylor's disputes, it cannot determine whether Mariner willfully violated 15 U.S.C. § 1681s-2(b)(1).

Accordingly, genuine disputes of material fact remain as to whether Mariner negligently or willfully violated its obligations under 15 U.S.C. § 1681s-2(b).  As a result, the Court will deny Mariner's motion for summary judgment with respect to whether its investigation was reasonable and whether any FCRA violation stemming from such investigation was willful.

## B.    Actual Damages and Causation

Mariner contends that it is entitled to summary judgment because Taylor cannot show that Mariner caused Taylor to suffer actual damages.  Specifically, Mariner asserts that the undisputed record shows that Mariner's reporting to the CRAs was always

---

[6] Mariner argues that even if Mariner is unable to show that its investigation was reasonable as a matter of law, summary judgment is appropriate because it can show that a reasonable investigation would not have led to a different result. *See Suluki v. Credit One Bank, NA*, 138 F.4th 709, 721 (2d Cir. 2025) ("Even assuming an investigation is not reasonable, courts have also concluded that summary judgment in favor of the furnisher is appropriate if a reasonable investigation would not have yielded a different result.").  Because this argument essentially concerns issues of causation, the Court will address this argument in the harm and causation section below. *See id.* at 721–22 ("In essence, a court granting summary judgment to a furnisher after concluding that no reasonable investigation would have yielded a different outcome does so based on causation . . . .").

positive and that Taylor was never denied credit or subject to any interest rate increases because of Mariner's conduct.  Mariner further argues that Taylor did not suffer genuine emotional injury.

Consumers are entitled to recover actual damages caused by a furnisher's violation of the FCRA, whether the violation was negligent or willful.  15 U.S.C. §§ 1681n(a)(1)(A), 1681o(a)(1).  Actual damages under the FCRA include pecuniary harm, such as denial of credit opportunities or higher interest rates, as well as emotional distress damages.  *Edeh*, 974 F. Supp. 2d at 1242.

Additionally, "[m]ental pain and anxiety can constitute actual damages" under the FCRA, "but emotional distress damages must be supported by competent evidence of 'genuine injury,' which 'may be evidenced by one's conduct and observed by others.'" *Taylor v. Tenant Tracker, Inc.*, 710 F.3d 824, 828 (8th Cir. 2013) (quoting *Carey v. Piphus*, 435 U.S. 247, 264 n.20 (1978)).  A plaintiff's sole testimony may establish emotional distress under the FCRA, but the testimony must show a "concrete" and "genuine injury." *Edeh*, 974 F. Supp. 2d at 1244.[7]  Whether a plaintiff suffered a physical injury or received medical treatment because of the emotional distress are factors that courts will consider in the analysis, though they are not dispositive.  *Taylor*, 710 F.3d at 829.  Courts have denied emotional distress damages under the FCRA where the consumer plaintiff

---

[7] *See also Sherman v. Sheffield Fin., LLC*, 627 F. Supp. 3d 1000, 1017 (D. Minn. 2022).

"suffered no physical injury, . . . was not medically treated for any psychological or emotional injury, and no other witness corroborated any outward manifestation of emotional distress." *Peterson v. Experian Info. Sols., Inc.*, 44 F.4th 1124, 1128 (8th Cir. 2022) (citations omitted); *accord Taylor*, 710 F.3d at 829.  In other words, without corroborating evidence of emotional injury, a plaintiff cannot survive summary judgment by relying on their own "self-serving and conclusory statements."  *Id.*

To begin with, it appears to be undisputed that Taylor was not denied credit because of Mariner's reporting, which is consistent with Mariner never reporting any delinquencies with respect to the 2020 loan to the CRAs.[8]  Accordingly, Taylor cannot show she suffered economic damages; she must instead rely on emotional distress damages to support her FCRA claim.

After careful review of the record and the parties' arguments, genuine disputes of material fact remain as to whether (1) Taylor suffered genuine emotional distress damages and (2) Mariner caused such damages.  Viewing the evidence in the light most favorable to Taylor, a reasonable jury could conclude that she suffered emotional distress as a result Mariner's continued reporting of inaccurate credit information and Mariner's failure to correct her credit reports.

---

[8] Likewise, Taylor testified that she did not believe the Mariner account was negatively affecting her credit because it was not one of the delinquent accounts.  (Taylor Dep. at 110:3–6.)

Taylor stated in discovery that she experienced "great distress, anger, annoyance and frustration in her daily life" (Zelman Decl. ¶ 4, Ex. C at 10) and later declared that she suffered "intense depression, anxiety and emotional distress" after discovering the fraudulent accounts associated with her stolen identity.  (Taylor Decl. ¶ 5.)  She sought medical treatment and was prescribed antidepressant medications.  (*Id*. ¶¶ 6, 14.)  Taylor further testified that she felt "helpless[] and hopeless[]," struggled with sleep, vomited from stress, and felt embarrassed by being forced to explain the presence of the Mariner account.  (*Id.* ¶¶ 13, 19–22.)  Although these statements could be construed as self-serving, these statements go beyond the mere conclusory statements deemed "incapable of surviving summary judgment."  *Peterson*, 44 F.4th at 1128 (noting that plaintiff's declaration and interrogatory responses that described her mental health issues "as 'extreme,' 'incredible,' and 'immense,' amount[ed] to self-serving and conclusory statements incapable of surviving summary judgment").  Accordingly, the Court finds that, viewing the facts in the light most favorable to Taylor, a reasonable jury could find that Taylor suffered a "genuine injury" and therefore an "actual injury" under the FCRA. *See Taylor*, 710 F.3d at 828.

As for causation, Mariner argues that Taylor's alleged emotional distress stems from her mother's identity theft and the stress of moving from New York to Minnesota. Mariner relies on Taylor's testimony in which she stated that she sought assistance from a psychologist through her employee assistance program because she was "having a really

difficult time" due to "the situation of not being in contact with [her] mother and moving away from New York to kind of rebuild [her] life." (Taylor Dep. 93:8–95:9.) Taylor likewise testified that her mother "traumatized" her by stealing her identity so that her mother could save her travel agency business. (*Id.* at 40:3–19.) Taylor also testified that she had not spoken to any medical providers or mental health providers about Mariner specifically. (*Id.* at 111:14–19.)

Although this evidence demonstrates that Taylor experienced significant distress as a result of her mother's identity theft and her move from New York to Minnesota, it does not establish that those were the **only** causes of her emotional harm.  To the contrary, Taylor expressly stated that her emotional distress was caused not only by the identity theft itself, but also by her repeated attempts to correct her credit report, which were ultimately rejected by Mariner. (Taylor Decl. ¶ 7.)  The record therefore contains evidence that multiple factors contributed to Taylor's emotional distress, including Mariner's alleged conduct.  Because the record reflects multiple potential sources of Taylor's emotional distress, determining the relative contribution of each source— including Mariner's alleged conduct—presents a material factual issue that is not appropriate for resolution at summary judgment.

In sum, the Court concludes that summary judgment is inappropriate because reasonable jurors could differ on both whether Taylor suffered compensable emotional

distress damages, and if so, the extent to which Mariner's conduct caused or contributed to those damages.

## III.    SANCTIONS

Taylor requests that the Court award sanctions under Federal Rule of Civil Procedure 56(h) based on Mariner's filing of the now-withdrawn Myers Declaration.  (Pl.'s Am. Opp'n Mem. at 47.)  Rule 56(h) provides for monetary sanctions if a party submitted an affidavit or declaration "in bad faith or solely for delay."  To award sanctions under Rule 56(h), the Court must find "bad faith," which generally requires "egregious" conduct. *Spencer v. Fed. Prison Camp Duluth*, Civ. No. 13-177, 2016 WL 4942037, at *32 (D. Minn. Aug. 1, 2016).  Because Taylor has not submitted sufficient evidence of bad faith, the Court will deny Taylor's request for sanctions.  Indeed, the fact that Mariner withdrew the Myers Declaration undermines any inference of bad faith.

## CONCLUSION

Plaintiff Melissa Taylor brought this action against various financial institutions and credit reporting agencies, including Mariner, alleging that they violated the FCRA after they refused to remove certain accounts from her credit reports after she reported that such accounts were the product of identity theft.  Taylor alleges that the sole remaining defendant, Mariner, violated § 1681s-2(b) of the FCRA by failing to reasonably investigate her disputes and correct such reports.  Taylor seeks to recover actual, statutory, and punitive damages, as well as attorney's fees and costs.  Because there are genuine disputes of material fact as to whether Mariner reasonably investigated Taylor's credit

disputes and whether Taylor suffered actual damages because of Mariner's alleged FCRA violations, the Court will deny Mariner's motion for summary judgment.

The Court will also deny Taylor's request for sanctions under Federal Rule of Civil Procedure 56(h) because Taylor has not presented sufficient evidence to establish that Mariner submitted the Myers Declaration in bad faith.

### ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant Mariner Finance, LLC's Motion for Summary Judgment (Docket No. [72]) is **DENIED**.

2. Plaintiff Melissa Taylor's request for sanctions pursuant to Federal Rule of Civil Procedure 56(h) is **DENIED.**

3. Absent objection, this case will be placed on the Court's next trial calendar.

DATED:  August 10, 2026                             _____/s/ John R. Tunheim_____
at Minneapolis, Minnesota.                              JOHN R. TUNHEIM
                                                       United States District Judge